**Mary Dell BURROWS, Appellant,**

v.

**CHEMED CORPORATION, d/b/a Vestal Laboratories, Appellee.**

No. 83–1987.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1984.

Decided Sept. 11, 1984.

Rehearing Denied Oct. 5, 1984.

Melba I. Parente, Clayton, Mo., for appellant.

John R. Truman, Spoehrer & Lemkemeier, St. Louis, Mo., for appellee.

Before ROSS, JOHN R. GIBSON and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Appellant, Mary Dell Burrows (Burrows), filed suit against her employer, appellee Chemed Corporation, d/b/a Vestal Laboratories (Vestal), alleging she was denied a promotion because of her sex in violation of 42 U.S.C. § 2000e. After trial the District Court *, 567 F.Supp. 978, found

---

* The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri.

that Burrows had not established her claim of unlawful discrimination, and entered judgment in favor of Vestal. Burrows appeals from that judgment. Finding neither any mistake of law nor any clearly erroneous factual determination, we affirm.

## I. Facts

In 1959 Burrows became a chemist for Vestal in St. Louis, Missouri. During her first year with Vestal, Burrows was the only quality control chemist in the company. In 1960 a quality control technician was added to the unit, and Burrows was given the title of unit head of quality control. Burrows never supervised more than one technician.

As unit head of quality control Burrows spent eighty percent of her time in the testing of products and raw materials to ensure their conformance to established standards of quality. The remainder of her time was spent performing various duties, including recordkeeping, ordering new supplies for the quality control division, performing shelf-life studies on drug products, and training new technicians. Burrows also testified that she performed some analytical work developing quality control tests in cooperation with the product development division for use by the quality control division. Her claimed degree of involvement in this activity was disputed by her supervisor, Dr. Norman Dewar, who contended that this was a very minor part of her job.

As will become clear, *infra*, it is important that we note certain functions which Burrows did not perform in her job. Burrows did not have the authority to resolve problems created by products which, after quality control testing, were found not to be in conformance with the established standards for that particular product. Neither did she work on the development of new products for Vestal. It is apparent from the record that Burrows' position de-

manded little, if any, creativity or initiative and consisted mainly of repetitive analytic tasks combined with some recordkeeping and employee training.

In 1966, Daniel Stueck became a laboratory technician for Vestal. His first nine months were spent as a laboratory technician in research and product development. He then worked for three months in the quality control division with Burrows as his supervisor. Following two years in the military, Stueck returned to Vestal in 1969, again working as a laboratory technician in the product development division. On receiving a degree in Chemistry from the University of Missouri at St. Louis in 1974, Stueck was promoted to product development chemist. In the product development division Stueck worked with the departmental director, Dr. James Wiedow, in the development of new products for Vestal. Later, in 1976 Stueck became an analytical chemist under Dr. Wiedow's direction. While working under Dr. Wiedow's direction, Stueck engaged in long-term, indepth research projects for Vestal.

Both the product development and quality control divisions were within the technical department of Vestal. The director of the technical department was Dr. Dewar. He had held that position since 1962, receiving the title of vice president in 1968. In 1978 Dr. Dewar lost two of his managers. One of the managers lost was Dr. Wiedow, who died. The other loss was caused by the promotion of Barbara Flint, director of the microbiology division, to the position of assistant to the president of Vestal. Dr. Dewar also was adapting the functioning of his department to respond to a shift in management philosophy being implemented by Vestal's new president. This shift in philosophy was designed to make the technical department more responsive to sales and marketing initiatives within the company. Dr. Dewar felt that a reorganization

of his department was needed both to strengthen the department's ability to cooperate with the sales and marketing departments in developing new products and to reduce the number of division heads reporting directly to him in the chain of command. Dr. Dewar decided to combine the existing quality control division with the analytical chemistry research division, and also to combine the two product development research groups under a single manager. This reorganization reduced the number of people reporting to Dr. Dewar by two, from six to four.

By this time, Stueck was serving as acting director of quality assurance. This position gave Stueck, in addition to his duties as an analytical chemist, the responsibility for resolving problems associated with products found not to be in conformance with established specifications by the quality control division, a function previously shared by Dr. Wiedow and Dr. Dewar. Burrows was continuing to perform her duties as unit head of quality control; a function that had changed little in the 19 years she had held it.[1]

Dr. Dewar selected Stueck for the new position of manager of quality control. In explaining his selection of Stueck instead of Burrows for the position Dr. Dewar noted that, although Stueck had not been with the company as long as Burrows, during his ten years of service Stueck had worked not only in quality control, but also in product development and research. Stueck had shown considerable initiative in the pursuit of his duties, working overtime and on weekends. Dr. Wiedow had given very high marks to Stueck on his performance evaluations. Burrows, in contrast, although her job performance had been consistently satisfactory during her years as unit head of quality control, had shown little initiative or desire for advancement. Burrows also lacked the same type of in-

---

1. There is some controversy in the record over how much Burrows' job changed over the years. While it is clear that the volume of work was constantly changing, and the company would sometimes change its products thus changing the actual tests performed, it is also clear that

the job remained the same in kind. Burrows still was a chemist performing tests, not creating new products or performing original research. When a test showed a problem with a particular batch, another company official would resolve the problem.

depth, purely theoretical research experience possessed by Stueck. This research experience on Stueck's part proved decisive to Dr. Dewar and he selected Stueck for the position of manager of quality control.

Dr. Dewar informed Burrows of the new position and the promotion of Stueck on July 6, 1979. This was the first that Burrows had heard of the impending change. Burrows was told that, though she had been considered for the position, Stueck had been selected. No reason was given for her rejection and no written job description existed for the new position of manager of quality control. Burrows, however, remained in the quality control division as lead control chemist for a period of time after Stueck's promotion. She informed Dr. Dewar of her desire to advance to the position of manager of quality control. Dr. Dewar informed her that it would be necessary for her to acquire experience in analytical chemistry research and in product development in order to qualify for that position. Although the new quality control division was working more closely with the product development division, Dr. Dewar informed her that the quickest way to obtain product development experience would be to transfer to the product development division as a full-time product development chemist. Burrows did so, and has worked in that division ever since.

## II. Discussion

### A. Sex Discrimination

■ Burrows' initial task at trial was to establish a prima facie case of discrimination. The elements of such a case are that: (1) plaintiff is a member of a protected class, (2) plaintiff applied for or was considered for the position in question, (3) plaintiff was not hired, and (4) the position remained open and others were sought for the position. *Wells v. Gotfredson Motor Co., Inc.*, 709 F.2d 493, 495–96 (8th Cir. 1983). A fact pattern otherwise meeting the above criteria and involving the grant or denial of a promotion may establish a prima facie case under Title VII. *Mortensen v. Callaway*, 672 F.2d 822, 833 (10th Cir.1982). The plaintiff's prima facie case, once established, creates a rebuttable presumption of discrimination. In order to avoid the effect of this presumption, the defendant must articulate a legitimate, nondiscriminatory reason for the personnel decision in question. Once the defendant has articulated such a reason, the presumption drops from the case and the plaintiff must show that the articulated reason is a pretext for a discriminatory decision. In the final analysis, where direct evidence of unlawful discrimination is lacking, the nature of the employer's true motive is a question of credibility. As the Supreme Court has stated: "In short, the district court must decide which party's explanation of the employer's motivation it believes." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The District Court's factual findings, including credibility determinations, are conclusive unless clearly erroneous. *Jones v. International Paper Co.*, 720 F.2d 496, 500 (8th Cir.1983).

In this case the District Court believed Vestal's version of the incident. The District Court found that Burrows had established a prima facie case but further found that Vestal had articulated a nondiscriminatory reason for Stueck's selection. Dr. Dewar stated that he selected Stueck because of his experience in product development and research. Once this evidence was introduced, the burden shifted to Burrows to demonstrate that the proffered reason was a pretext for a discriminatory motive. After finding that Burrows had failed to carry this burden, the District Court ruled in favor of Vestal.

The District Court also found that a "personality clash" existed between Dr. Dewar and Burrows. Although the District Court stated that it inferred this clash from the witnesses' demeanor at trial, counsel for Vestal suggested at oral argument and in his appellate and trial court briefs that the real source of the personality clash was the fact that Dr. Dewar was a research scientist and Burrows was a "bu-

reaucrat," a performer of routine assembly-line tests. It is clear from the record that Dr. Dewar preferred to have research scientists in management positions. This preference for research scientists such as Stueck over production testing chemists such as Burrows is not forbidden by Title VII or any other federal statute.

■ Thus, the District Court found both an objective and a subjective basis for Dr. Dewar's decision—the stated need for product development experience in the new position, and a "personality clash" between Dr. Dewar and Burrows, which apparently was based on Dr. Dewar's preference for research scientists. Since the District Court found no credible evidence to indicate pretext or a discriminatory motive, it found in favor of Vestal. Having carefully reviewed the record, we find that the District Court's holding was not clearly erroneous.

Dr. Dewar's preference for research-oriented chemists clearly was demonstrated at trial. One former manager under Dr. Dewar was a microbiologist named Barbara Flint. Flint joined the company in 1973 and by 1976 had been promoted to microbiology research manager. In 1978 Flint was promoted to assistant to the president of Vestal, and she later became a vice president in charge of operations in 1979, and subsequently executive vice president in charge of operations in 1980, thus making her second in command at Vestal. In a performance appraisal of June 22, 1977 Dr. Dewar made the following comments on Flint's performance:

> Barb is a highly motivated, hard working and responsible professional with a keen analytical mind that probes problems in-depth and synthesizes the best path to resolution. Her intelligence is very high and she takes a mature approach to her work. She has excellent supervisory ability and is as demanding of herself as of her subordinates. In the area, new to her, of customer and sales force contact, she has done an excellent job in the past year. Her work is precise, accurate and meticulous in detail. She has the poten-

tial for taking on additional and more complex management responsibilities.

Trial Exhibit H–3. Dr. Dewar's high opinion of Flint was a factor in her promotion to assistant to the president of the company and later to vice president.

Similarly, Dr. Dewar rewarded Said Raziq's considerable ability as a product development chemist, in spite of his weak management skills and questionable attendance record. Dr. Dewar referred to Raziq as a "golden goose" who developed products that made large sums of money for Vestal. Trial Transcript at 4–34.

Other evidence presented at trial tends to show that women were accorded opportunities for advancement at Vestal and that Vestal was sensitive to the need for affirmative action. In 1979 Jolee Plaggenberg, a woman, was made director of personnel for Vestal. This promotion culminated a three-year period in which she had taken increasing responsibility for Vestal's personnel management. Plaggenberg was instrumental in requiring written annual employee evaluations for all professional personnel at Vestal. One section of these evaluations required supervisors to rate their employees with respect to their attitudes towards minorities and women as it related to Vestal's affirmative action program.

It is clear from the record that Stueck's interest and experience in research and development was greater than that of Burrows. Burrows showed little or no interest in becoming more involved in the purely creative areas of scientific research. Her position left little time for such pursuits; its main purpose was to turn out a large volume of work in assembly-line fashion. She had stayed in the same position for twenty years, with no indication of any desire to engage in research. Only after Stueck was promoted did she show any desire to broaden her background and experience in order to advance within the company, and then she was given such opportunities. On these facts, we hold that the trial court was correct in finding that Burrows was not discriminated against because of her sex.

## B. Harassment and Retaliation Against Burrows

Burrows also charges that Vestal retaliated against her for filing this lawsuit. Burrows cites several actions by Vestal which she alleges were designed to punish her for filing suit under Title VII including: redesignation of her position title from unit head of quality control to control chemist with a temporary technical reduction in grade from 14 to 13 (her salary was not reduced and her pay increases were still based on grade 14); her transfer to a position as a product development chemist with a reduction in grade to 13 from 14; meetings held with Burrows by company officials after she filed suit but before trial; and the refusal of Vestal to pay Burrows for time she spent in court in connection with this lawsuit.

■ The District Court found that these actions by Vestal toward Burrows were not taken in retaliation for her Title VII action. We do not find that any of the District Court's findings in this regard are clearly erroneous.

The redesignation of Burrows' position title was part of the overall reorganization of the quality control division, a reorganization motivated by valid management reasons. The temporary grade reduction came as a result of an assignment of grades to positions throughout the company, lasted only three months, and did not result in a reduction in salary. Moreover, although Burrows was assigned a grade 13, her salary and pay raises were still computed as if she were a grade 14.

Burrows' transfer to the position of product development chemist came as a result of her inquiries to Dr. Dewar as to the best method of advancing to the position of manager of quality control. Dr. Dewar advised her that she would need product development experience as well as additional management training. Although Dr. Dewar stated that the reorganization of the quality control division made it possible to gain the necessary product development experience by working exclusively in quality control, it would take considerably longer in that position than it would working as a product development chemist full time in the product development division. Dr. Dewar therefore recommended that Burrows apply for a position as a product development chemist in order to broaden her skills. Burrows merely took Dr. Dewar's advice as to how to advance her career goals. Knowing that her new position would be a grade lower than her previous grade, she took it in order to gain quickly the experience necessary to advance her career in the direction she desired.

Burrows also charges that two meetings between Paul Voet, the president of Vestal at that time, and her constituted harassment in retaliation for her filing a complaint with the Equal Employment Opportunity Commission in preparation for filing this lawsuit. There is conflicting testimony regarding the content of these meetings. Burrows characterizes them as consisting almost solely of criticism of her for filing an EEOC claim. Voet states that the meetings were called to discuss Burrows' career advancement with the company and that he specifically avoided discussion of the EEOC charge and its merits during the meetings. This conflicting testimony thus raised a question of credibility, which we must review under the clearly erroneous standard. Having carefully reviewed all testimony regarding these meetings, we hold that the District Court's conclusion that Vestal did not harass Burrows was not clearly erroneous.

Burrows claims that the failure of Vestal to grant her a leave of absence with pay for the time away from work required by this litigation constituted retaliation for engaging in protected activities under Title VII. Similarly, Burrows claims that the failure of Vestal to pay her witnesses who were company employees for the time they spent as witnesses in court, while at the same time paying those who served as witnesses for Vestal, constituted a penalty for engaging in protected activities. We disagree.

Burrows cites *Kyriazi v. Western Electric Co.*, 469 F.Supp. 672 (D.N.J.1979) in

support of her claim for leave with pay. *Kyriazi,* however, is distinguishable. The employees testifying in that case were members of a class involved in a Stage II proceeding under Title VII for determination of the amount of damages to be awarded to each class member, following a determination of liability in a Stage I proceeding. Moreover, Western Electric's insistence upon individual damage award determinations for each of the 1,700 class members necessitated the Stage II proceedings. *Id.* at 674. Burrow's case involved an initial determination of liability which she lost, not a separate proceeding to determine damages. Burrows' action was not a class action, nor did others in the company join in the action. There is no indication whether the *Kyriazi* court permitted an award of compensation for time missed from the defendant's employ for witnesses called by the plaintiff in the Stage I proceeding.

With respect to the witnesses called by Burrows, a careful review of the record reveals that the District Court never was clearly presented with the question of which of Burrows' witnesses were and were not paid for their time in court. Vestal's attorney assured the court that those employee/witnesses called by Burrows who were exempt under the wage and hour laws would be paid for their time in court. Trial Transcript at 7–21 to 7–24. The record is silent as to whether the non-exempt employee/witnesses called by Burrows were paid for their time spent testifying. Burrows' attorney never pressed this point before the District Court, and thus it is not properly before us.

With respect to Burrows' time spent in court, we must keep in mind that she was unsuccessful in her claim. Had she won the case, she would have been entitled to attorneys' fees, costs and an appropriate

award. We see no need to require a winning defendant to pay the litigation expenses of an unsuccessful plaintiff, and we cannot say that defendant's refusal to do so in this case constitutes harassment.

## C. Age Discrimination

█ Burrows also alleges that, even if the denial of the promotion was not based on sex, it was based on age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34. Burrows points to District Court Finding of Fact No. 14 which states that a "significant factor" in Dr. Dewar's decision was the relative youth of Stueck in comparison to Burrows. Our review of the record leads us to the conclusion that this finding of fact is unsupported by the record and was clearly erroneous. Nowhere was Dr. Dewar or any other Vestal official questioned regarding Burrows' age. Burrows did not present any testimony at trial concerning age discrimination and did not allege it in her complaint. The only reference to age came on the third day of trial, when George Jakel, a vice president of Vestal called as a witness by plaintiff, remarked on cross-examination that had he made the promotion decision, he would have considered Burrows' age as a factor in reaching a decision. Jakel in fact had nothing to do with the promotion decision of which Burrows complains, and thus his testimony does not support a conclusion that Dr. Dewar considered age as a factor. Since no other evidence at trial pointed to age discrimination, Burrows' claim of age discrimination is unsupported by the record and therefore can only be viewed as being totally without merit.[2]

## III. Conclusion

We have considered Burrows' other contentions and find them also to be without

---

**2.** Burrows contends that the presence in the record of a charge of discrimination form filed with the Equal Employment Opportunity Commission provides another ground on which a finding of discrimination on the basis of age may be found. Defendant's Exhibit S–3. Even assuming *arguendo* that this form provides the

District Court with sufficient evidence to make out a prima facie case of age discrimination, we find that the same nondiscriminatory reasons that rebutted her prima facie case of sex discrimination would rebut her prima facie case of age discrimination. *See, supra,* pp. 615–16.

merit. The order of the District Court is affirmed.