**Kathy O'CONNOR, Plaintiff,**

v.

**PERU STATE COLLEGE, Board of Trustees of the Nebraska State Colleges, Jerry L. Gallentine, Clyde J. Barrett, Harold D. Deselms, Jerry D. Joy, Ervin Pitts, Wayne Davidson, Maxine Mehus, Defendants.**

Civ. No. 83–L–253.

United States District Court,
D. Nebraska.

Feb. 22, 1985.

---

**2.** The facts indicate that the CVS packaging is unique and not an unprivileged imitation of the

ECOTRIN® box.

754

Jill Nagy and Kathy Goudy, Lincoln, Neb., for plaintiff O'Connor.

George C. Rozmarin, Swarr, May, Smith & Andersen, P.C., Omaha, Neb., Richard L. Halbert, Falls City, Neb., for defendants.

## MEMORANDUM OPINION

VAN PELT, Senior District Judge.

This action was brought by plaintiff O'Connor, a non-tenured instructor, for injunctive relief and damages against Peru State College, Peru, Nebraska, her employer, and certain of its officers. She alleges discrimination in the course of her employment and in the termination thereof on account of her gender; alleges she was frustrated in attempting to perform her duties in violation of Title IX (20 U.S.C. § 1681 et seq.); and that she was punished for exercising rights protected by the First and Fourteenth Amendments to the United States Constitution. The grounds of her claim are set forth in greater detail later in this opinion. She sues all of the defendants except the defendant Jerry D. Joy, in their official capacities only. Joy is sued personally, as well as in his official capaci-

ty. A motion for a temporary restraining order was filed. A hearing was had May 6, 1983, and this Judge, for reasons set forth in Filing No. 16 filed herein June 17, 1983, denied the motion for temporary restraining order or in the alternative for a preliminary injunction, as shown by the Order, Filing No. 14, also entered June 17, 1983.

The United States Court of Appeals for the Eighth Circuit, by Order entered February 22, 1984, affirmed the district court's judgment by written opinion filed the same date.

A First Amended and Supplemental Complaint was filed May 18, 1984. Among other things, it added as a defendant, Maxine Mehus.

A pre-trial conference was held on October 1, 1984, by the Judge. See Filing No. 37 dated October 15, 1984. The case came on for trial on October 15, 1984, and continued for four days.

It has been submitted on briefs and is now ready for decision.

This opinion will constitute the findings of fact and conclusions of law of the Court.

## THE FACTS

Plaintiff was employed by Peru State College as a physical education instructor and women's basketball coach for the academic years 1981–82 and 1982–83. Defendants are Peru State College; the Board of Trustees of the Nebraska State Colleges; Jerry L. Gallentine, President of Peru State College; Wayne Davidson, Chairman of the Physical Education Division and Director of Athletics for the second semester during the 1982–83 academic year; Maxine Mehus, present Director of Athletics; and Clyde J. Barrett, Vice President of Academic Affairs. Jerry D. Joy was Director of Athletics during 1981–82 and the first semester of 1982–83 and is currently Dean of Student Affairs.

Peru State College, located in Peru, Nebraska, is one of four four-year colleges organized under the Constitution and Statutes of the State of Nebraska. *Neb.Rev. Stats.* (NRS) Sections 85–301 to 318 (Reissue 1981). The general government of these colleges is vested in a seven member Board of Trustees, six of whom are appointed by the governor with the advice and consent of the legislature. The Commissioner of Education is a member ex officio. NRS 85–301. Under Section 85–316, all funds of the college are under the direction and control of the trustees. However, all warrants for money to be expended under Sections 85–301 to 85–318 are to be drawn by the Director of Administrative Services (another state agency) on certificates executed by the college president, countersigned by the college secretary and by a member of the Board. Warrants are paid by the State Treasurer. The College may retain $10,000 for equitable adjustment to students who are so entitled, for day-to-day operations and for contingencies requiring immediate payment.

Teaching loads at Peru State are determined by the number of credit hours taught per semester as opposed to the number of hours actually in contact with the students (contact hours). For example: a lecture course may be assigned three credit hours and also require three contact hours per week for the instructor to be present before the class lecturing; whereas, an activity class may be designated as one credit hour, but actually require the instructor to be present with the students for two or three hours. It is felt by the administration that a lecture class generally requires more preparation time by an instructor than an activity class. Coaches are allotted a certain number of credit hours for their coaching duties known as release time. The normal teaching load is 12–15 credit hours. If a class is cancelled because a minimum number of students failed to register, the instructor scheduled to teach that class is assigned to the admissions division to spend a specified amount of time in general recruiting and in publicity activities to promote the college.

In August, 1981, when Ms. O'Connor was offered the position of instructor and women's basketball coach, she had an undergraduate major in English and had com-

pleted her course work and thesis, but not her orals, for a Master's Degree in Physical Education. She subsequently received this degree in August, 1982.

It was, and is, the practice at Peru State to "plug" new faculty members into the course schedule vacated by their predecessors. Ms. O'Connor was assigned to teach courses totaling 12–13 hours, including release time of six hours in the fall for coaching basketball and three hours in the spring of 1981–82 for assisting with track. As a result of the plug-in policy, Ms. O'Connor found herself teaching several activity classes, in one of which, dance, she had no training whatsoever. Thus, the preparation time required to teach this class was greatly in excess of the normal preparation time required for activity classes.

As women's basketball coach, she had both varsity and junior varsity squads. Her coaching duties included recruiting high school student athletes to attend Peru State and organizing and conducting a girls' high school invitational basketball tournament. Another duty for which she found herself responsible was sponsoring the cheerleading squad which consisted of arranging transportation to out-of-town games, general chaperoning and checking expenditures. At one time when a scheduled class did not fill, Ms. O'Connor was assigned to 60 hours of general recruiting for admissions.

When Ms. O'Connor began coaching, she found that the women's uniforms and equipment were in very poor condition, both in quality and quantity. During the season, the women's locker room was commonly used by the visiting men's basketball team. Since the women's games were often played just prior to the men's games, conflicts arose. At one time, the visiting men entered the room before the women had vacated, catching the girls in various stages of dress or undress. It was also common for both the Peru State men's and women's teams to be conducting practice sessions concurrently. Of the four basketball courts, one of them was closely ringed by bleachers, which created a hazardous

condition for players during skirmishes at the net ends where the likelihood of falling into the bleachers was greatest. It seemed to Ms. O'Connor that her players were required to use this court for practice much more frequently than the men. Ms. O'Connor voiced her complaints about the equipment and facilities to Jerry Joy, Ervin Pitts, Chairman of the Physical Education Division in 1981–82 who retired after the spring of 1982, and Wayne Davidson, as well as fellow faculty members. In addition to practice court assignments, there was some controversy over a universal weight machine purchased with funds raised by the Women's Athletic Association, a student organization, but which was also being used by the men.

During Ms. O'Connor's first season, it was noticed that she arrived late or not at all to several practices and games. Men's basketball coach, John Gibbs, whose team often practiced concurrently with the women's team, and Wayne Davidson noted that women's team practices appeared to be unorganized. Despite the fact that Coach O'Connor initiated pre-season conditioning, there was further testimony on both sides as to whether or not the team was or was not in good condition. While Coach O'Connor's win/loss record of 7 wins 19 losses in 1981–82, and 6 wins and 19 losses in 1982–83 was better than the previous coach (1 and 21 for both years 1979–80, 1980–81), it is not outstanding and shows no improvement the second year, despite the return of most of the players. Ms. O'Connor attributed this to the fact that she was able to have more games scheduled against stronger opponents, although she herself was not directly responsible for setting up the schedule for the basketball season.

From the record, it would appear that Ms. O'Connor was lax on follow-up. There were several instances in which she had filled in the proper forms for excused absences, but where notice of her potential absence did not reach the proper persons. Consequently, they assumed willful neglect on her part. Another time, illness forced her to miss an important coaches meeting

and again the proper person did not receive word of her illness until several days after the meeting. · Ms. O'Connor frequently placed the responsibility upon the players for continuing practices in her absences. Once players returned from Christmas break early to attend a scheduled practice only to find the gym locked, that no provisions for their early return had been made at the dormitories, and that Coach O'Connor had not returned. Ms. O'Connor did make an effort to get a non-student, non-staff person authorized to act as a volunteer assistant coach. However, college rules would not allow the use of a person unassociated in any way with the college and permission was denied.

In addition to Ms. O'Connor's communication problems with Jerry Joy and Wayne Davidson, she also had disagreements with fellow faculty members over teaching assignments and her general attitude toward socializing with students on week-ends.

Despite the first year problems and a lower evaluation than any other faculty member in the Physical Education Division, then Chairman, Ervin Pitts recommended that Ms. O'Connor be rehired for the 1982–83 academic year. Under the college by-laws, non-tenured faculty members who have been employed for two or more years must be notified by December 15 if their contract is not to be renewed for the following academic year. Thus, although the basketball season had just gotten underway, on December 9, 1982, Ms. O'Connor was notified that she would not be rehired for the 1983–84 year. She requested and received a written list of reasons for her non-renewal and a hearing. The hearing was scheduled for February 9, 1983, at which time Ms. O'Connor could have been represented by an attorney. She chose to invite Dick Kirtenbach of the Nebraska Civil Liberties Union, who attended only as an observer. Plaintiff did have this opportunity to rebut the written reasons supplied to her in December. After this meeting, the administration affirmed its decision to not renew Ms. O'Connor's contract.

On April 27, 1983, Plaintiff filed suit in the United States District Court, Lincoln, Nebraska, alleging violations of 20 U.S.C. § 1681 (Title IX); 42 U.S.C. § 1983; and 42 U.S.C. § 2000e *et seq.* (Title VII). Ms. O'Connor claimed the reasons given by Peru State for non-renewal were pretextual and that she was being dismissed in retaliation for her complaints and activities to improve the status of the women's athletic program in general, and the women's basketball program in particular. She alleged that Peru State was and had been according their women's athletic program unequal treatment in terms of facilities, equipment, and financial assistance compared to that given the men's programs. She further alleged that as part of this discriminatory attitude, she was assigned heavier teaching loads and was expected to perform more numerous extracurricular duties than her male counterparts in the Athletic Department. Plaintiff also asserts that her rights under the First Amendment, Freedom of Speech clause and the Fourteenth Amendment's Equal Protection and Due Process clauses were violated. She moved for a preliminary injunction and a temporary restraining order prior to a hearing on the merits. After a hearing on this motion in May, 1983, the TRO was denied on June 17, 1983. An appeal was taken to the Court of Appeals for this circuit, which affirmed the District Court's denial of the TRO. *O'Connor v. Peru State College,* 728 F.2d 1001 (8th Cir.1984).

Also in May, 1983, Ms. O'Connor filed complaints with the Nebraska Equal Opportunities Commission and the United States Department of Education, Office of Civil Rights, Region VII in Kansas City. The EEOC completed their investigation in August, 1983, and met with Peru State College officials in November, 1983. They issued a right-to-sue letter to Ms. O'Connor dated April 20, 1984. Subsequently, she filed a First Amended and Supplemental Complaint in the United States District Court, Lincoln, Nebraska, May 8, 1984. In the amended and supplemental complaint, plaintiff dropped an alleged breach of contract complaint and added Ms. Mehus as a

defendant. A copy of the right-to-sue letter was attached. A trial on the merits was had in October, 1984.

## CONCLUSIONS OF LAW

Plaintiff has filed for relief under 20 U.S.C. § 1681 (Title IX), 42 U.S.C. § 1983, and 42 U.S.C. § 2000e *et seq.* (Title VII) and the First and Fourteenth Amendments. This Court has subject matter jurisdiction under 20 U.S.C. § 1683, 28 U.S.C. § 1343, and 42 U.S.C. § 2000e–5(f)(3).

■ Defendants claim that Peru State College may not have the capacity to be sued. Such capacity depends upon state law. *Byron v. University of Florida,* 403 F.Supp. 49, 54 (N.D.Fla.1975); *Rivas v. State Bd. for Community Colleges,* 517 F.Supp. 467 (D.Col.1981). Under Nebraska Statute, the Board of Trustees of the Nebraska State Colleges constitutes a body corporate for the purposes of governing the State colleges. *Neb.Rev.Stat.* 85–302, (Reissue 1981); *Levitt v. Bd. of Trustees of Nebraska State Colleges,* 376 F.Supp. 945, 946 (D.Nebr.1974). It is the Board's responsibility to appoint a President for each college (NRS 85–304) who is the chief executive officer in charge of the control and management of the college. NRS 85–306. For purposes of 42 U.S.C. § 2000e(b), the Board is an "employer" as defined by the statute.

■ However, the Board of Trustees of the Nebraska State Colleges and any officers of Peru State College being sued in their official capacities only, are entitled to immunity from damages under the Eleventh Amendment for purposes of Title IX and § 1983 actions. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

In *Catania v. University of Nebraska,* 204 Neb. 304, 282 N.W.2d 27 (1979), the Nebraska Supreme Court held that the University of Nebraska was a state agency entitled to Eleventh Amendment immunity. The state court went on to say that the state may only be sued where there is specific legislation to that effect. The mere presence of the words "sue" or "be sued" in the description of powers of the Board of Regents, or in the present case, the Board of Trustees of the Nebraska State Colleges, does not constitute a waiver of the state's immunity. "This provision is not self-executing; legislation is necessary to make it available." *Wiseman v. Keller,* 218 Neb. 717, 719, 358 N.W.2d 768, 770 (1984). *See also: Cannon v. University of Health Science/The Chicago Medical School,* 710 F.2d 351, 356 n. 5 (7th Cir. 1983). Thus, waiver will be found only "where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909) quoted in *Edelman* at 673; *Wiseman* at 720, 770. The state court in *Wiseman* held specifically that NRS section 20–148 under Title 20, the Nebraska Civil Rights Act, did not act to waive the state's immunity as to actions brought in Federal Court under 42 U.S.C. § 1983 to protect rights under the contract clause of the Constitution.

Furthermore, under NRS 85–316, any monetary damages which might be awarded against Peru State College would be paid out of the State Treasury. Peru State is a small college, unlike the University of Minnesota, to which it was compared by plaintiff. It has no large reserves of non-state appropriated financial resources. *Durham v. Parks,* 564 F.Supp. 244 (D.Minn.1983). Despite the fact that the college may well have funds from endowments or gifts, endowment funds and private donations are generally created or given for a specific purpose and cannot be used for expenses outside the scope of the gift. The endowment fund designated by NRS 85–317 mentioned by plaintiff as a source of income outside legislative appropriations, arises from the sale of public school lands and is to be managed for the benefit of all the state colleges by the Board of Trustees and, thus, is also part of state funds.

■ Plaintiff has also misapplied the Eighth Circuit case of *Board of Trustees of Arkansas A & M College v. Davis*, 396 F.2d 730 (8th Cir.1968). In that case, the appeals court found that the defendant trustees had acted beyond their authority as representatives of the college and held them liable for damages on an individual basis under *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed.2d 714 (1908). The court recognized that, otherwise, the individual defendants in their official capacities would be entitled to partial immunity under the Eleventh Amendment. In the present case, the only defendant being sued in an individual capacity in addition to his official capacity is Jerry Joy. While some of Mr. Joy's decisions were not necessarily fair or helpful in building a good relationship within the department, there is insufficient evidence to find that he intentionally pursued a course of discrimination against Ms. O'Connor in his official capacity, let alone to raise his actions to the level necessary to find him guilty of intentional discrimination against plaintiff in an individual capacity.

## TITLE IX

■ Ms. O'Connor has no Title IX claim. Arguably, she is a person entitled to raise the issue of sex discrimination because of her employment as an instructor in the Physical Education Division at Peru State College. Under Title IX, 20 U.S.C. § 1681(a):

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, ..."

Subsection (c) defines "educational institution," but "education program or activity" is not defined in the statute. The United States Supreme Court, in *North Haven Bd. of Education v. Bell*, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982), held that Title IX covered employment discrimination in federally funded programs, but specifically declined to define "program." *Id.* at 540, 102 S.Ct. at 1928. This led to a split among the Circuit Courts. The Third Circuit chose to define "educational program" as the entire institution. *Grove City College v. Bell*, 687 F.2d 684 (3rd Cir.1982), aff'd in part, —— U.S. ——, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). The First, Fifth, and Sixth Circuits took a narrower view, limiting the application of sanctions to the specific programs within a school or college which were receiving federal funds. *See: Bennet v. West Texas State University*, 525 F.Supp. 77 (N.D.Tex.1981), rev. w/o opinion 698 F.2d 1215 (5th Cir.1983) but cited four months later for its programmatic application of Title IX in *Iron Arrow Honor Society v. Heckler*, 702 F.2d 549 (5th Cir.1983); *Rice v. President and Fellows of Harvard College*, 663 F.2d 336 (1st Cir.1981), *cert. den.* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982); *Hillsdale College v. Dept. of Health, Education, and Welfare*, 696 F.2d 418 (6th Cir.1982). The United States Supreme Court finally clarified the definition of "program" in *Grove City College v. Bell*, —— U.S. ——, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). The Court concluded that receipt of federal aid by students in the form of Basic Educational Opportunity Grants (BEOGs) made the financial aid program of Grove City College subject to regulation under Title IX even though the college received no direct federal funds for any other program. In limiting the regulation to the financial aid program, the Court stated:

"Only by ignoring Title IX's program-specific language could we conclude that funds received under the RDS, awarded to eligible students and paid back to the school when tuition comes due represent federal aid to the entire institution...."

"We conclude that the receipt of BEOGs by some of Grove City's students does not trigger institution-wide coverage under Title IX."

*Id.* ——, 104 S.Ct. at 1221.

Evidence presented at trial showed that the Physical Education Division at Peru State received no direct federal funds. The only direct federal grant money received by Peru State was a Title III grant to support

faculty and student research projects. While the grant was approved for the 1982–83 school year, the application was not signed until March, 1983, and equipment purchases were not made until September, 1983, long after the decision to not renew Ms. O'Connor's contract had been made. There was testimony to the effect that some of the research projects submitted in this Title III grant proposal would be studies conducted in the Physical Education Division. Even had this grant been received in time to benefit Ms. O'Connor, compliance with Title IX would have been required only in the selection of research projects and the distribution of funding for those projects. Since research proposals could be submitted from any department in the college, the mere fact that one or more of the projects submitted might have involved the Physical Education Division would not be sufficient to bring the entire athletic program within the purview of Title IX, absent any direct federal funding to physical education programs.

Ms. O'Connor had been granted funding for a research project on vertical jump performance using the women basketball players to be conducted during the 1982–83 year. The project was in conjunction with plaintiff's studies pursuant to the acquisition of a doctorate. There was no evidence as to the specific source of funding for this project, although there was testimony that some of the Title III grant monies were to be used to equip a physiology laboratory to which members of the Physical Education Division faculty would have access, but not exclusive control.

■ Even if the issue of Title IX violation had not been eliminated by virtue of the fact that there was no federal funding received by the Athletic Department at Peru State, the Title IX issue has been eliminated by the fact that disparities between the men's and women's athletic programs are in the process of being equalized. A representative of the EEOC conducted an extensive investigation of the alleged Title IX violations during the summer of 1983. The college was found not to be in compliance with Title IX requirements in the area of equality of equipment and facilities, but no charges were filed. The college prepared a written plan to correct the noted disparities which was acceptable to the Office of Civil Rights. At the time of trial, new uniforms and other equipment had been purchased for the women's programs, and steps taken to ensure that such incidents as the visiting men's intrusion into the women's locker room while they were dressing would not happen again. These steps, while slow in coming, render any need for court action unnecessary at this time.

■ Plaintiff may argue that her complaints to the EEOC and subsequent law suit were the catalysts for any corrective action taken by defendants. However, Ms. O'Connor was neither the first nor the only individual to campaign for better equipment for the women athletes. Ms. Mehus testified that she too had requested better equipment and treatment for the women's teams even before Ms. O'Connor had been hired. The evidence is not sufficient to find that Ms. O'Connor's complaints were the major incentive in effecting the improvements for the women's athletic program at Peru State.

### § 1983 RIGHTS

■ Plaintiff does not have a claim under 42 U.S.C. § 1983 either. Section 1983 requires deprivation of "a right ... secured by the Constitution and laws."

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."

*Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.... He must, instead, have a legitimate claim of entitlement to it.... Property interests ... are created and their dimensions are defined by existing rules or under-

standings that stem from an independent source...."

*Id.* at 577, 92 S.Ct. at 2709.

Ms. O'Connor was a non-tenured instructor. Under the by-laws of Peru State College, tenure will not be offered until the faculty member has served a minimum of four years. The by-laws provided that a non-tenured faculty member would be provided with written notice not later than December 15 when their appointment expired at the end of the school year (May) when the faculty member had been employed two or more years. The by-laws further state that if the faculty member requests, he/she will be advised of the reasons which contributed to that decision of non-renewal. The faculty member may request reconsideration by the recommending body or individuals.

Ms. O'Connor's first year as an instructor-coach was not entirely smooth going. Dr. Pitts, Athletic Director in 1981–82, gave her a lower evaluation than anyone else in the department, but reappointed her to provide an opportunity for improvement. Wayne Davidson assumed the position of Athletic Director in the fall of 1982 and was responsible for the recommendation to not renew plaintiff's contract for 1983–84. She was properly notified in writing on December 9, 1982. Ms. O'Connor requested and received a written statement of reasons contributing to that decision. She also requested and received a reconsideration meeting, held February 9, 1983. At that meeting, Ms. O'Connor had an observer from the Nebraska Civil Liberties Union present, but not an attorney. In any event, plaintiff was offered the opportunity to rebut or question the basis of the decision and the validity of the reasons supplied to her. The fact that she did not make full use of that opportunity does not negate its existence.

The terms of plaintiff's agreement provided for notice and a chance to be heard in the case of a non-renewal of a year-to-year teaching contract. Ms. O'Connor received this property interest. There was no deprivation of any procedure to which she was entitled.

■ Just as there was no violation of property interest, neither was there a violation of any liberty interest. Like the plaintiff in *Roth,* Ms. O'Connor was simply not rehired for another year at Peru State. The school did not charge her with any activity which might have damaged her standing in the community or which might have precluded her obtaining another position. *Roth* at 573, 92 S.Ct. at 2707. Difficult as it may be to find another position in a crowded job market, there is simply no deprivation of a liberty interest where plaintiff is free to enter that market and compete on the basis of her own skills, much as her basketball teams compete, and win or lose, based upon their condition and skill relative to the condition and skill of their opponents.

■ Plaintiff alleges one of the unarticulated reasons for her non-renewal was a reaction by officials against her outspoken criticism of the Athletic Department and the treatment women athletes received. There is no evidence of this. Both Dr. Barrett and Mr. Davidson testified that Ms. O'Connor's criticisms were not considered when they decided not to renew her contract; nor can Ms. O'Connor point to a specific instance which might have triggered an invasion of her right to free speech. In order for a firing or non-renewal of a contract to be in violation of the employee's right to free speech, there must be a specific action or actions by the employee and a subsequent reaction by the employer concluding in the termination of the prior relationship. *Pickering v. Bd. of Ed. of Township High School Dist. 205, Will Co.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The Supreme Court in *Pickering* discussed factors which could be considered in the determination of whether or not school administrators infringed upon plaintiff teacher's right to free speech. The Court focused upon the degree of public interest

at stake and the legitimate concerns of taxpayers in the issues brought out by the teachers' actions and contrasted those to any detrimental effect plaintiff's actions might have had on maintaining the day-to-day order in school operations and his working relationships with administration and fellow teachers. The test of whether the speech or action by the employee is constitutionally protected entails striking a "balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering* at 568, 88 S.Ct. at 1734.

In *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) the Supreme Court required plaintiff to show causation, in that his/her conduct was constitutionally protected and that it was a substantial or motivating factor in the decision not to rehire him/her. The burden was then to shift to the defendant to show by a preponderance of the evidence that the employer could have reached the same decision even in the absence of the protected conduct. The test for causation must distinguish between a result caused by a constitutional violation and one not so caused. *Id.* at 286–287, 97 S.Ct. at 575–76.

The Court in *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) considered the distinction between "public expressions" and "private expressions" as motivating factors in the firing of a school teacher. The freedom of speech is not lost to the public employee who "arranges to communicate privately with his employer rather than to spread his views before the public." *Id.* at 415–416, 99 S.Ct. at 696–97. However, private expression may "bring additional factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message, but also by the manner, time, and place in which it is deliv-

ered." *Givhan* at 415 n. 4, 99 S.Ct. 696 n. 4. *See also: Brockell v. Norton*, 688 F.2d 588 (8th Cir.1982); *Nathanson v. United States*, 702 F.2d 162 (8th Cir.1983); *Bowman v. Pulaski Co. Special School Dist.*, 723 F.2d 640 (8th Cir.1983).

In order to fall within the purview of the First Amendment protections, the content of the employee's speech must encompass matters of public concern.

"When employee expression cannot be fairly considered as relating to any matter of political, social or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."

*Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

"We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

*Id.* at 147, 103 S.Ct. at 1690.

Ms. O'Connor has not met her burden of proof. Granted, her complaints were in relation to an area of public concern, namely, the equal treatment of women athletes and the women's athletic program at Peru State College. But, there must be a traceable connection between action and alleged reaction. Here there is none. Plaintiff did not put her complaints in writing; she did not publish them in any manner; she did not report the alleged Title IX violations until after her notice of non-renewal. Plaintiff can point to no specific incident, complaint or discussion which could be said to have triggered defendant's decision to not rehire her. She could not offer any evidence that her complaints were either a substantial or motivating factor in defendant's decision. These facts essentially re-

duce plaintiff's situation to one more comparable to that of a personnel decision in which the federal court only reluctantly intervenes.

On the other hand, defendants testified that they did not consider her complaints when they decided not to renew plaintiff's contract. Furthermore, they articulated legitimate reasons for non-renewal such as to support a finding that, even if plaintiff's complaints had contributed to their decision, the same decision could have been reached in the absence of the protected conduct. In this situation, the court finds that the administration did in fact base their decision to not renew Ms. O'Connor's contract upon other valid reasons unrelated to any expressions by the plaintiff protected by the First Amendment.

## TITLE VII

Plaintiff is alleging in her Title VII suit (42 U.S.C. § 2000e, *et seq.*) that Peru State College in the person of its president, Jerry L. Gallentine, and the Board of Trustees of the Nebraska State Colleges, discriminated against her on account of her gender in the course of her employment as women's basketball coach and instructor in the Physical Education Division and in the termination of that employment. Plaintiff's general arguments fall into the "disparate treatment" category of discrimination.

▇ The burden of proof is upon plaintiff to show that defendants acted with a discriminatory motive, though motive may be inferred from differences in treatment. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The defendant must produce "evidence that the plaintiff was rejected, or someone else preferred, for a legitimate non-discriminatory reason." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

▇ "The 'factual inquiry' in a Title VII case is '[whether] the defendant intentionally discriminated against the plaintiff.' *Burdine* ... at 253, 101 S.Ct. at 1093." *Aikens* at 715, 103 S.Ct. at 1482. Plaintiff has not presented any evidence to the effect that officials at Peru State deliberately treated her less favorably in the terms and conditions of her employment than any other new instructor in the same situation. Plaintiff has failed to carry her burden of proof. New teachers at Peru State are assigned basically the same courses their predecessor taught. The first semester Ms. O'Connor taught classes which had been scheduled in the spring of 1981 before she was offered and accepted the position in August, 1981. Individual classes could be, and were, reassigned among the instructors, but wholesale rescheduling was impracticable. Ms. O'Connor did not protest her teaching schedule for the 1982–83 season until the fall, instead of working with Dr. Davidson in the spring of 1982 when the schedule was first laid out.

Plaintiff alleges that she was assigned excessive duties because of her gender. Although it might appear that she did have a greater teaching load than others in the athletic department based on contact hours, teaching loads are determined on the basis of credit hours. In this regard, Ms. O'Connor was assigned a number of class credit hours comparable to other instructors at her level. Ms. O'Connor protested her assignment to general recruiting for the college when her regularly scheduled class was cancelled for lack of student enrollment. This was the usual practice and recruiting hours were calculated to replace only those hours which the instructor would have spent teaching. Three other faculty members from various departments were also assigned such duties during that semester.

Ms. O'Connor points to the fact that she was informed that, in addition to her teaching-coaching activities, she was automatically sponsor of the cheerleading squad and had duties to recruit high school ath-

letes for attendance at Peru State, and for the women's athletic program specifically, and to organize and run a women's high school invitational basketball tournament.

Sponsoring the cheerleading squad consisted of chaperoning them to out-of-town games, which occasionally involved overnight stays and general light supervision of their money-raising activities. Most college approved student groups have faculty advisors. It is logical that the cheerleaders' sponsor should be a member of the athletic department. It is also reasonable to have a woman sponsor the cheerleaders (all girls) rather than a man in view of the need for overnight supervision involved with some away from Peru games.

Written or unwritten, all coaching positions require the coach to be responsible for keeping in touch with high school athletics and recruiting students with potential to benefit the college athletic program, male and female. Because of budget restrictions, the coaches at Peru State did, and do, much of this recruiting on their own time, with their own money. There were no differences in this respect between the male coaches and either Ms. Mehus or the plaintiff.

The high school invitational basketball tournament acts as a promotional device for the college and would certainly aid in the recruiting of women athletes. Such a tournament should reduce or supplement individual efforts by providing for a wider distribution of teams and players than might be practical for the coach to view under his or her own efforts. It is not discriminatory to assign the conduct of this tournament to the basketball coach, whomever that may be. The duty comes with the job, not the individual coach.

The teaching-coaching staff in the athletic department at Peru State is small and each individual has different responsibilities and background experience. It is difficult to make comparisons where there are few similarities, however, plaintiff has not demonstrated discrimination in the terms of her employment.

Plaintiff did not demonstrate any discriminative motive in the conditions of her job, either directly or by inference. Defendants, on the other hand, presented reasons for the nonrenewal of Ms. O'Connor's contract, which, though weak, were legitimate. Whether or not Ms. O'Connor was actually as casual in her attitude toward punctuality and attendance at practices, games, and classes as defendants would have the court believe, there is no doubt that they did believe she was entirely too lax in these areas. It is clear that much of the confusion and misunderstanding arose out of lack of proper communications between Ms. O'Connor and the administration of the Physical Education Division, particularly Jerry Joy and Dr. Barrett.

Plaintiff insists that she notified her students and made arrangements for any practices or classes she had to miss. Yet, two of her students, one of whom was student manager for the team during the 1982–83 season, testified they had little or no notice of Ms. O'Connor's absences from team practices. Plaintiff gave no reason why she had not made arrangements and was not present when the team returned early from the Christmas-New Year Holiday break for a scheduled practice only to find themselves locked out of the gym and dorms. Men's basketball coach, John Gibbs, testified to noticing a number of practice sessions for which Ms. O'Connor was not present.

Testimony was heard concerning two games to which Ms. O'Connor was late. One was clearly a scheduling error for which Ms. O'Connor was not responsible. However, it would have been a simple precaution to double check time with the opposing coach, especially when it was necessary to drive a long distance for the game. In the other instance, Ms. O'Connor had permission to attend a relative's funeral, which caused her to arrive late. But, she had not informed the team of her need to be late, nor did she arrange for another member of the Physical Education Division to cover until she arrived.

There was a third incident in which Ms. O'Connor did not complete the trip home with the team. Plaintiff testified she stayed in Omaha to observe a high school game to assess potential recruits. Again, she did not notify her team or the parents who were also accompanying the team. As a result of these poorly explained absences, team confidence in her lagged. In coaching, more than in any other teacher-student relationship, the coach must be able to inspire her players. This is an intangible ability; yet it may be sensed in many ways. In evaluating Ms. O'Connor's performance as a coach, the administration may well have noticed a lack of enthusiasm in the team's performances or in the players' relationships to Ms. O'Connor.

Last, but not least, Ms. O'Connor missed an important coaches meeting due to a sudden illness. While she could be excused for becoming ill, the problem arose with her notification to Jerry Joy. There was conflicting testimony on this matter, but the final impression of a serious communication gap between Ms. O'Connor and the administration is clear. Because of these absences, late arrivals and early departures, excused or not, the impression created in the minds of the administration was one of lack of organization, follow through, and an overly casual attitude toward responsibility on the part of Ms. O'Connor. These are not desirable characteristics in any teacher or coach and gave the administration legitimate concern for the effectiveness of such an individual.

In addition to a general impression of laxity on the part of Ms. O'Connor, it is also clear from the testimony of other members of the athletic department, that their working relationships with Ms. O'Connor were not all smooth and congenial. Ms. O'Connor is an intelligent, articulate individual who, when she perceives what she believes to be a wrong, plunges in to correct the situation. In the course of her campaign, she managed to rub most of the other members of the department the wrong way. As previously mentioned, there are only eight faculty members in the athletic department. By necessity, they must be able to function easily on a daily basis. It is the distinct impression of this Court that Ms. O'Connor's personality did not lend itself to a close cooperative effort within this small department. The smooth functioning of a department based upon compatibility of personalities is a legitimate consideration in the selection of personnel to fill a position. *See: Burrows v. Chemed Corp.*, 743 F.2d 612, 616 (8th Cir.1984).

Plaintiff had the burden of proving a showing of pretext on the part of the defendants by a preponderance of the evidence.

"Merely casting doubt on the employer's articulated reason does not suffice to meet the plaintiff's burden of demonstrating discriminatory intent for '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons' in the first place. (cites omitted)".

*White v. Vathally*, 732 F.2d 1037, 1043 (1st Cir.1984).

The issue at trial is not the quality of the business judgment, but rather whether the plaintiff can show she was the victim of intentional discrimination.

"A plaintiff cannot prove that the employer's reason for his discharge was pretextual merely by claiming that the employer's action was mistaken. The law is clear that an employer's reason for his action may be a good reason, a bad reason, a mistaken reason, or no reason at all, as long as the decision was not based on race or other unlawful discrimination criteria.... (cites omitted). An employer is not required to prove that its decision was correct; the tryer of fact need only determine that the defendant, in good faith, *believed* the plaintiff's performance to be unsatisfactory and that the asserted reason for the action was not a mere pretext for discrimination. (cites omitted)."

*Bostic v. Wall*, 588 F.Supp. 994, 1002 (W.D. N.C.1984).

The Court finds no credible evidence to indicate pretext or discriminative motive by

those whose duty it was to make the determination as to plaintiff's retention. There is no evidence of harassment. The Court accepts the testimony of the defendants, that by their action in not renewing Ms. O'Connor's contract, they sought to strengthen the women's athletic program at Peru State.

In the opinion of the Court with reference to the granting of the temporary relief, *O'Connor v. Peru State College*, 728 F.2d 1001 (8th Cir.1984), mention is made of the Court's discussion in the original opinion of the possibility of success on the merits. This Court would not deny that upon hearing the original motion for injunctive relief from which the appeal was taken that the Court did discuss the possibility of success on the merits, and the Court's conclusion from the evidence presented was that her chance of succeeding on the merits in a trial of the case was not sufficient to justify any form of temporary relief at that time.

Because the original panel may have had a different view of the evidence than I had, I have given special consideration to the rights of plaintiff, a non-tenured instructor, under each and all of the theories which she has advanced to recover in this case. I can reach no other conclusion on the facts than that which is herein set forth.

Peru State College is the smallest of the four state colleges. Kearney is the largest. The town in which Peru State is located is smaller than that of any other city in which a state college is located. Whether, in a town the size of Kearney which exceeds the enrollment of Creighton by 2000 students or more, the college officials would have granted tenure is not an issue.

I do not feel that the constitutional rights of plaintiff have been violated by any of the defendants. I believe that for Peru State College they made the proper decision in not retaining plaintiff.

It seems to me that the federal courts would be placing too heavy a hand upon the choosing of faculty to say that the conduct of plaintiff which the administrative officers believe did not evidence that she was proper faculty and coaching material should by judicial fiat, be imposed upon the administration, the faculty, or the student body.

Plaintiff did not maintain the burden of proof the law places upon her. The defendants have each affirmatively established that their action was taken in good faith to build a better Physical Education Division at Peru State.

The complaint will be dismissed, by separate order, at plaintiff's costs.