Kathy O'CONNOR, Appellant,

v.

PERU STATE COLLEGE, et
al., Appellees.

No. 85–1394.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 13, 1985.

Decided Jan. 2, 1986.

Kathy Goudy, Lincoln, Neb., for appellant.

George C. Rozmarin, Omaha, Neb., for appellees.

Before BOWMAN, Circuit Judge, HENLEY, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

WOLLMAN, Circuit Judge.

Kathy O'Connor appeals the dismissal after a bench trial of her claims against her former employer, Peru State College, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 (1982), under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. (1982), and under 42 U.S.C. § 1983 (1982). The district court found that O'Connor was not subjected to discriminatory employment conditions and was not discharged either for discriminatory reasons or in retaliation for her criticism of the school's treatment of women athletes. The court further found that O'Connor failed to state a claim under Title IX because there was no showing that the appropriate program received federal funds, or in the alternative, that her Title IX claim failed because she did not prove her suit was the "catalyst" for subsequent improvements in the conditions and status of female athletes at Peru State. O'Connor challenges these conclusions as clearly erroneous and based on improper evidence. We affirm.

Kathy O'Connor was hired by Peru State College as a physical education teacher and women's basketball coach for the 1981–82 academic year. She was assigned an average teaching load in terms of credit hours but was given a large number of "activity classes," that is, classes which required two or three hours of classroom supervision (but supposedly less outside preparation) for each credit hour awarded. Among O'Connor's activity classes were several in dance, in which she had no training and thus had to spend abnormal amounts of preparation time. Her other duties at times included coaching also the junior varsity women's basketball team, recruiting high school athletes, organizing a girls' high school invitational basketball tournament, assisting with the women's track team, and chaperoning and transporting the cheerleaders to men's events.

Despite low evaluations, O'Connor was rehired for the 1982–83 academic year; however, on December 9, 1982, she was notified that she would not be rehired for

the 1983–84 academic year because Peru State wished to "establish confidence" in its women's basketball program. In a further list of reasons for her nonrenewal presented at a hearing in February 1983, Peru State faulted O'Connor for missing a national athletic association meeting; for failing on one occasion to send a team roster to tournament officials; for arriving late to one basketball game and getting the team to others late; for once scheduling varsity and junior varsity games for the same day in different cities; for using an unauthorized assistant; for leaving basketball practices unsupervised when she had to be absent; for poor recruiting; for poor staff relations; for organizational problems regarding the high school invitational tournament; and for inattention to detail in keeping track of basketball expenses.

After Peru State reaffirmed its employment decision, O'Connor in April 1983 filed this suit in federal court[1] plus a complaint with the Office of Civil Rights of the U.S. Department of Education. The OCR investigators concluded that while Peru State during the years of O'Connor's employment had been in violation of Title IX because of inequities in certain portions of its men's and women's athletic programs, the college would be found in compliance because it had already begun implementing a plan that would correct the disparities within a reasonable time. O'Connor's court action ultimately came to trial in October 1984, with the results already stated. *O'Connor v. Peru State College*, 605 F.Supp. 753 (D.Neb.1985).

■ O'Connor's challenges on appeal go mostly to the district court's findings of fact; thus, our review is governed by the "clearly erroneous" touchstone. *Anderson v. City of Bessemer City*, —— U.S. ——, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *see*

Fed.R.Civ.P. 52(a). Under this standard we may not make our own independent determination of the facts and reverse if we would have decided the case differently: If there are two permissible views of the evidence, the factfinder's view must be affirmed. *Craft v. Metromedia, Inc.*, 766 F.2d 1205, 1212 (8th Cir.1985) (citing *Anderson*, 105 S.Ct. at 1512). We may overturn the result below only if on the entire evidence we are left with " 'the definite and firm conviction that a mistake has been committed.' " *Anderson*, 105 S.Ct. at 1511 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Findings based on credibility determinations particularly may "virtually never" be clear error. *Anderson*, 105 S.Ct. at 1512, *quoted in Craft*, 766 F.2d at 1212.

### I.

■ O'Connor argues that the district court clearly erred when, in rejecting her Title VII claim based on conditions of employment, it concluded that she was not assigned a heavier load either as to classes or outside duties and that she was not required to spend more of her own time and money in recruiting.[2] O'Connor indisputably taught more activity classes than any of the male coaches, and it would not be a complete answer to say that course loads were measured only by credit hours had it been proven that activity courses were clearly more onerous and that they fell disproportionately to female faculty. The record, however, suggests that it was primarily dance classes, because of her lack of background, rather than activity classes that O'Connor found onerous; and the district court found from conflicting testimony that new instructors were "plugged in"

---

1. O'Connor first sought a temporary restraining order or preliminary injunction, both of which were denied. *O'Connor v. Peru State College*, 728 F.2d 1001 (8th Cir.1984).

2. Because of our conclusion, we need not reach Peru State's argument that O'Connor's conditions of employment claim is time-barred. We observe, however, that the cases relied on by

Peru State arise in the context of terminations and tenure and could not easily be extended to hold that the time for filing conditions of employment claims runs only from the time the employer determined to impose the discriminatory conditions. There seemingly would be a "present violation" at any moment when job conditions were inequitable.

to the schedules of their predecessors. *O'Connor*, 605 F.Supp at 757. While such a finding would not shield Peru State if its "plug in" practice were perpetuating the effects of past discriminatory assignments of activity courses, *see Peters v. Missouri-Pacific Railroad*, 483 F.2d 490, 498 (5th Cir.), *cert. denied*, 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 238 (1973), O'Connor has not shown that the female predecessor from whom she inherited the dance classes did not have that load because she was qualified in dance. Furthermore, O'Connor herself notes that she was the only person at Peru State qualified to teach aquatics, which accounts for other of her activity classes. The record does show that in the only instance in which a male was assigned a dance class, the class was actually taught by a female; but while we may have found this fact more suggestive than did the district court, it alone is insufficient to leave us with the "definite and firm conviction" that O'Connor's class assignments were colored by the fact that she was female.

Also in relation to class schedules, O'Connor asserts that, contrary to her own experience, males in the physical education department were never assigned to do general admissions work for the college when one of their classes failed to fill. The record does include the testimony of one male coach who twice had hours that did not fill; but while he stated unequivocally that he was never assigned admissions work, on at least one of those occasions he substituted additional coaching duties. Also, male faculty from other departments of the university were assigned admissions duty. We cannot find that the district court clearly erred in failing to characterize this one possible isolated incident as a sexually discriminatory employment condition. *Cf. Hill v. K-Mart Corp.*, 699 F.2d 776, 778 n. 3 (5th Cir.1983) (no discriminatory treatment when employer failed to call plaintiff to two out of nearly 100 meetings).

With respect to outside activities, as the district court notes, it is difficult to compare and evaluate the time and effort involved in dissimilar activities, *O'Connor*, 605 F.Supp. at 765; and although the record is quite clear as to O'Connor's duties, it does not show that male faculty had no or fewer outside duties, only that those duties did not exactly correspond with O'Connor's. For example, there was testimony that while attempts to have a boys' high school basketball tournament failed from lack of interest, a male coach was responsible for coordinating a junior high school invitational track meet. O'Connor sponsored the cheerleaders for less than a semester; and while less seemed to be expected of the male coaches who subsequently took that duty, the circumstances of the switch and the fact that the cheerleaders are no longer the responsibility of the physical education department indicate more just a change in the structure and functioning of cheerleaders at Peru State than the discriminatory imposition of greater burdens on female coaches. O'Connor's dual role in coaching both varsity and junior varsity women's basketball while the men's junior varsity was student-run could have been related to the need for more supervision given the greater number (particularly the first year) of males participating. Furthermore, the testimony was that the student coaches were volunteers obtained by the men's basketball coach, and there is no suggestion that O'Connor had solicited such student volunteers but was denied their use. The assistant who was held to be unauthorized was neither a student nor an employee at Peru State, and testimony is equivocal as to whether male coaches ever actually used such persons as assistants.

O'Connor's final claims of error in the finding of no discriminatory job conditions go to recruiting and the alleged requirement that she report her absences while male coaches did not have to report theirs. The testimony on the absences issue was equivocal, while the only evidence of disparity in recruiting went to the extra travel help given male coaches by a booster and to Peru State's failure to follow up O'Connor's leads as to sources of similar outside support for women athletes. Circumstances surrounding the latter lapse were not

sufficiently developed for us to say that the district court clearly erred in rejecting the inference · that discrimination, rather than other factors, caused Peru State's failure to pursue the women's funding, and the booster did eventually offer help to O'Connor also in recruiting. We must affirm the holding of the district court that Peru State did not burden O'Connor with a class load, outside duties, or administrative restrictions inconsistent with those imposed on male physical education faculty and coaches.

## II.

O'Connor argues that the district court erred when, in rejecting her claim of discriminatory discharge under Title VII, it found that Peru State failed to rehire her because of her "casual attitude" toward attendance and punctuality at practices and games and because of her poor working relationships with other members of the athletic department. *O'Connor,* 605 F.Supp. at 765–66. In addition to urging that this conclusion was factually incorrect, O'Connor asserts that the absences rationale was not actually legitimate and non-discriminatory and that the district court improperly evaluated the evidence in that it failed to recognize the inference of pretext that arises when male employees are not penalized for engaging in behavior similar to that cited by the employer in regard to the female. *See McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 281–84 (1976); *McDonnell Douglas v. Green,* 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); *e.g., Equal Employment Opportunity Commission v. Minneapolis Electric Steel Casting Co.,* 552 F.Supp. 957 (D.Minn.1982).

Formal statements of the pattern and burdens of proof in discriminatory discharge cases set out three steps: 1) the plaintiff must establish a "prima facie case," that is, facts sufficient to give rise to an inference that the termination was motivated by discrimination; 2) the employer then must articulate an alternate legitimate reason for the discharge sufficient to dispel the unfavorable inference; and 3) the plaintiff may attempt to show that the reason articulated by the employer was pretextual and that the employer actually was improperly motivated. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1211 n. 5 (8th Cir.1985); *Easley v. Empire, Inc.,* 757 F.2d 923, 929 n. 6 (8th Cir.1985). At this point we are concerned only with the ultimate issue in the case—which party's explanation of the employer's motives is to be believed. *See United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *Easley,* 757 F.2d at 929–30.

■ It is not enough, however, that an employer have a "reasonable" or "genuine" basis for a discharge if that basis is not applied equally to both sexes, *Namenwirth v. Board of Regents of the University of Wisconsin System,* 769 F.2d 1235, 1240 (7th Cir.1985), *cert. denied,* ___ U.S. ___, 106 S.Ct. 807, 88 L.Ed.2d 782 (1985), and a district court errs in looking at the reasons for a female employee's discharge in isolation when there are allegations that males are accorded different latitude. *Id.* at 1241. Here, however, despite the lack of direct mention, we believe that the district court did consider evidence as to the male coaches' tardiness and absences from practices. Testimony suggested that O'Connor's problem was not her absences and tardiness per se but her failure to notify the team of her scheduled absences and to leave directions for practice and an authorized assistant in charge. For example, there was evidence that sometimes the women players, after waiting for O'Connor to appear and receiving no word or instructions, would just go home. While O'Connor disputes this version and Peru State's witnesses could pinpoint but one or two of the supposedly repeated times such things happened, we cannot find that the district court clearly erred in proceeding on the basis that as a matter of fact the conduct for which O'Con-

nor was discharged was dissimilar to that of the male coaches. *Cf. Kenyatta v. Bookey Packing Co.*, 649 F.2d 552, 555 (8th Cir.1981) (no clear error in finding that company's rule on absences was uniformly applied when there was testimony that no white employee, in contrast to black plaintiff, had four unexcused absences).

As to O'Connor's inability to function compatibly with other members of the athletic department, some amplification again is needed. While this can be a legitimate reason for discharge, *Burrows v. Chemed Corp.*, 743 F.2d 612, 615–16 (8th Cir.1984), when the lack of harmony germinates from the sex discrimination, the two cannot be artificially separated. *Patterson v. Masem*, 774 F.2d 251, 256 (8th Cir.1985); *Hickman v. Valley Local School District Board of Education*, 619 F.2d 606, 609 (6th Cir.1980) (cited with approval in *Roberts v. Van Buren Public Schools*, 731 F.2d 523, 527 n. 3 (8th Cir.1984)); *cf. Burrows*, 743 F.2d at 615–16 (basis for personality clash in sex discrimination case was the supervisor's preference for research scientists over bureaucrats in the position plaintiff held; court specifically noted that such a preference was not forbidden by Title VII). We do not believe here, however, that the district court, despite its language, *O'Connor*, 605 F.Supp. at 766, found a personality conflict strictly on this impermissible basis. There was evidence in the record of disputes relating to, for example, whether a given female athlete could participate in two sports with overlapping seasons; and even controversies traceable to the discrimination may be the basis for discharge if the employee acts in an egregious or excessively disruptive manner. *See Hickman*, 619 F.2d at 609.

Turning to O'Connor's factual challenges, we first observe that a plaintiff may show pretext, and thus discriminatory motive, through indirect evidence casting doubt on the degree of credence properly accorded the employer's articulated reasons, *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095, and that in fact a plaintiff may on occasion prevail without offering evidence beyond the prima facie case if strong cross-examination causes the employer's articulated reasons to fall from their own lack of credibility. *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095; *e.g., Brown v. Eckerd Drugs*, 663 F.2d 1268, 1272 (4th Cir.1981), *vacated on other grounds*, 457 U.S. 1128, 102 S.Ct. 2952, 73 L.Ed.2d 1345 (1982). O'Connor asserts that Peru State's explanations for her discharge were unworthy of credence because, for example, the college at the February hearing relied on problems not attributable to her and on incidents occurring after it had already decided not to rehire her. Peru State cited scheduling conflicts for which O'Connor was not responsible, faulted her for missing a meeting when she allegedly was ill, and possibly never told her that the assistant she was using was unauthorized. An employer's misjudgment of an employee's qualifications and misconceptions as to the facts surrounding her job performance may be probative of whether the reasons articulated for an employment decision were merely pretexts for discrimination. *Burdine*, 450 U.S. at 259, 101 S.Ct. at 1096; *Coble v. Hot Springs School District*, 682 F.2d 721, 727 (8th Cir.1982); *cf. Vaughn v. Westinghouse Electric Corp.*, 702 F.2d 137 (8th Cir.1983) (upholding finding of pretext despite district court's express statement that plaintiff did have some work deficiencies), *cert. dismissed as improvidently granted*, 466 U.S. 521, 104 S.Ct. 2163, 80 L.Ed.2d 531 (1984).

Similarly, an inference of pretext can be drawn from an employer's general policies and attitudes toward women, *see McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1825; *Easley v. Empire Inc.*, 757 F.2d 923, 931 (8th Cir.1985), and such evidence existed here in the form of the OCR report finding inequities during O'Connor's tenure between the men's and women's athletic programs. An employer's asserted reliance on subjective factors—e.g., "conduct of [O'Connor] which the administrative officers believe[d] did not evidence that she was *proper faculty and coaching material,* " *O'Connor*, 605 F.Supp. at 767 (emphasis added)—particularly is to be closely

scrutinized for discriminatory abuse. *Easley*, 757 F.2d at 930–31; *Royal v. Missouri Highway & Transportation Commission*, 714 F.2d 867, 869 (8th Cir.1983).

The district court's decision to credit the sincerity of the reasons articulated by Peru State, however, is a determination of fact subject to the clearly erroneous standard of review, *Pullman-Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), *cited in Anderson*, 105 S.Ct. at 1508; and O'Connor retains the ultimate burden of proving discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *Craft v. Metromedia, Inc.*, 766 F.2d 1205, 1211 (8th Cir.1985). There is ample evidence in support of the district court's choice to believe Peru State's, rather than O'Connor's, explanation of the college's motives for its employment decision. Beyond O'Connor's absences and tardiness, various witnesses testified to the women's basketball team's apparent lack of conditioning and lack of knowledge of basketball fundamentals; and one of O'Connor's former players testified that while the team had been enthusiastic the first year, the decline in morale occurred at the beginning of the second season before the decision not to rehire O'Connor had been made. Furthermore, a number of the reasons relied on by Peru State at the February hearing did have some support in the record, for example, O'Connor's failure to give participants in the high school tournament sufficient advance notice as to the dates and times of their games, and what was seen as her unrealistic recruiting approach in spending too much time in Omaha and not enough time visiting smaller rural high schools.

■ Given this body of evidence, we cannot find that the district court made an impermissible choice in rejecting the inferences of pretext raised by O'Connor and finding that Peru State genuinely believed a new coach was essential to the further development of its women's basketball program. *Cf. Talley v. United States Postal Service*, 720 F.2d 505, 508 (8th Cir.1983) (not clear error to reject allegations of pretext despite use of subjective employment criteria and evidence of past discriminatory treatment of plaintiff), *cert. denied*, 466 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984). Once the factfinder has determined that the employer's reasons were not a pretext for illegal discrimination, there is no basis for a Title VII claim. *See Clay v. Hyatt Regency Hotel*, 724 F.2d 721, 725 (8th Cir.1984). Courts may not interfere with honest business judgments just because they consider them unfair or misguided. *See Adolphe v. St. Louis Community College*, 753 F.2d 687 (8th Cir. 1985) (per curiam).[3]

■ Our conclusion that we may not upset the district court's findings is not altered by O'Connor's arguments concerning admissibility of evidence. Her main objection is that events occurring after she had already been notified of her termination were irrelevant and could not be used by Peru State in justifying its employment action. We agree with the district court that such evidence was admissible on the question of the propriety of reinstate-

---

**3.** We point out the difference between a trial court saying, "Because the employer made a mistake or relied on honest business judgment, there is no basis for a Title VII claim," and saying, "Because the employer made a mistake or relied on honest business judgment, we find no discriminatory intent." The former statement is legitimate and self-obvious: Title VII protects employees against discrimination—not against all foibles in employment relationships.

The second statement, however, is a tautology. In a case involving discrepancies between an employer's articulated reasons for a personnel decision and fact, fairness, and good sense, the real issue is whether such discrepancies are truly the product of error or the exercise of judgment with which others might differ or whether the discrepancies are the product of the type of makeweight rationalization which may signal the presence of improper motives. A court making the second statement makes the decision that no discriminatory intent existed when it accepts the label "mistake" or "business judgment." By using that label as a step towards or justification of its finding of no discrimination, the court runs the danger of appearing to have ignored the inferences in the plaintiff's favor arising from the discrepancies and to have accorded too much deference to the self-serving characterizations of the employer.

ment, an equitable remedy; and to the degree that such evidence was not admissible on issue of discriminatory motive,[4] error is not a ground for reversal in a case tried to the court when there is sufficient competent evidence to support the judgment and it does not appear that the court was induced by the incompetent evidence to make essential findings that it otherwise would not have made. *Holt v. Sarver*, 442 F.2d 304, 307 (8th Cir.1971); *Friedman v. Fordyce Concrete*, 362 F.2d 386, 389 (8th Cir. 1966); *see also Rosenberg v. Pritchard Services*, 774 F.2d 293, 295 (8th Cir.1985) (court sitting as factfinder presumed to have disregarded all incompetent evidence). We believe that the district court's opinion outlines the broad evidentiary base of its conclusions with sufficient clarity that we can say that any possibly inadmissible evidence did not affect the result and thus would not warrant reversal here.

### III.

O'Connor argues that the district court erred when, in rejecting her claim that she had been terminated in retaliation for her exercise of first amendment rights, it found no causal connection between her speech and Peru State's employment decision. The issue is one of fact, *Roberts v. Van Buren Public Schools*, 773 F.2d 949, 954 (8th Cir.1985), and we cannot find that the district court clearly erred. Having accepted the Title VII finding as to the existence of legitimate nondiscriminatory reasons—such as the absences and tardiness—for O'Connor's discharge, it would be inconsistent to now say we had "the definite and firm conviction" that, contrary

to the finding of district court, *O'Connor*, 605 F.Supp at 764, Peru State would have renewed O'Connor's contract absent her protected speech. *See Roberts*, 773 F.2d at 953–54 (citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)).[5]

### IV.

Finally, O'Connor argues that the district court erred when, in rejecting her Title IX claim, it held that Peru State did not receive federal funds within the meaning of the statute's program-specific requirement, as interpreted by the Supreme Court in *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). Title IX prohibits sex discrimination "under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. The federal financial assistance relied upon by O'Connor was a Title III grant, *see* 20 U.S.C. § 1057 (1982), awarded to Peru State in part for student and faculty research. A central research facility was to be established, and the college then was to select the projects and departments that were to have access to the facility and funds.

The district court held that the "program or activity" as to which O'Connor had to show federal funding was the physical education department and that the Title III grant did not constitute federal financial assistance under Title IX because the funds did not go "direct" to the physical education department and because other departments of the college also benefited.[6]

---

4. We do not reach Peru State's argument that post-termination evidence was made relevant to this issue by the college's reaffirmation of its decision after the February hearing.

5. Because we affirm the trial court's finding of lack of causal connection between O'Connor's speech and her termination, we need not consider the court's additional suggestion that O'Connor failed to show that she engaged in any protected speech. We note, however, that the trial court's observations in this regard may not be supported by the record or decisional law.

6. The district court's apparent first holding was that while the grant period was to begin October 1, 1982, a little more than two months before Peru State determined not to renew O'Connor's contract, and the money was deposited in Peru State's account at that time, the grant was not then effective to require Title IX compliance because no equipment was purchased until the following September. *O'Connor*, 605 F.Supp. at 761. (The application signed in March 1983, referred to by the district court, apparently concerned only the second year—that is, the 1983–84 academic year—of the three-year grant.) We think it unlikely that Congress intended that a

The program funded, the court concluded, was only the research grant project itself. *O'Connor*, 605 F.Supp. at 761.

This result is not mandated by *Grove City*. As the Supreme Court itself has recognized, neither in *Grove City* nor in its earlier decision in *North Haven Board of Education v. Bell*, 456 U.S. 512, 540–41, 102 S.Ct. 1912, 1927–28, 72 L.Ed.2d 299 (1982), did it undertake to provide general guidelines as to the proper definition of the "program or activity" receiving federal funds. *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 635–36, 104 S.Ct. 1248, 1255, 79 L.Ed.2d 568 (1984) (case involved discrimination against the handicapped under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982), but the Court expressly looked to cases involving Title IX, which is similarly worded, for guidance). The Court specifically stated in *Grove City* that financial aid programs, with which it dealt there, were sui generis. 465 U.S. at 573, 104 S.Ct. at 1221. The application of the program-specific requirement in broader contexts since *Grove City* has apparently not been considered in this circuit, and most appellate and district courts which have found it necessary to reach the issue have ruled more by edict than analysis. Still, two basic approaches may be identified.

The first approach defines the "program or activity" from the institutional perspective. For example, the relevant program is declared to be the department in which the plaintiff teaches, and the court then looks to the existence of any funds bearing that particular department's name. *E.g., Zangrillo v. Fashion Institute of Technology*, 601 F.Supp. 1346, 1352 (S.D.N.Y.1985); *see also Mabry v. State Board for Community Colleges*, 597 F.Supp. 1235, 1239 (D.Colo.1984). Only the very smallest subunits of an educational institution are declared "programs," *cf. Storey v. Board of Regents of the University of Wisconsin System*, 604 F.Supp. 1200, 1201 n. 1 (W.D.

Wis.1985) (questioning whether the "program" would be the Department of Poultry Sciences as compared to the College of Agriculture and Life Sciences), and "programs" seemingly cannot overlap or be parts of larger programs. Thus a court using the institutional perspective approach might conclude that a college receiving only nonearmarked federal assistance would be free to discriminate in, for example, Program X because Program X itself would not be receiving federal financial assistance. *See* Note, *The Program Specific Reach of Title IX*, 83 Colum.L.Rev. 1201, 1213–15 (1983). Such an approach creates the anomalous result that the more broadly an institution may use its federal funds, the less encompassing will be its Title IX coverage.

The district court in O'Connor's case basically applied the institutional perspective in that it looked to whether the physical education department received federal financial assistance in its name and held that because physical education was not the *entire* "program"—i.e., other parts of the college could also submit research projects, *O'Connor*, 605 F.Supp. at 761—it could not have been a part of the "program" at all.

This approach seems to conflict with *Grove City*. The district court, for example, retained the direct/indirect distinction expressly rejected by the Supreme Court. *See O'Connor*, 605 F.Supp. at 760–61. Just as the student financial aid in *Grove City* was no less federal funding received by the college's financial aid program for being channeled through students rather than being given directly to the college, the use of research funds for a physical education research project was no less federal financial assistance to the physical education department for being channeled first through an administrative structure overseeing the research program and facility for the entire college. Congress in enacting Title IX did not intend to elevate form over substance, *Grove City*, 465 U.S. at

college control the date at which it is required to comply with Title IX by holding federal

funds in its bank account.

564, 104 S.Ct. at 1217, and a college's choice of administrative mechanisms neither expands nor contracts the breadth of the "program or activity" receiving federal funds. *Id.* at 572, 104 S.Ct. at 1220–21; *cf.* 34 C.F.R. § 106.2(h) (1985) (defining a "recipient" of federal funds as including an entity which receives those funds from another recipient). The economic effect of the Title III funding was the same as if a portion of it had been granted direct to the physical education department. *See Grove City*, 465 U.S. at 565, 104 S.Ct. at 1215.

The district court's approach also seems to equate O'Connor's argument with arguments for institution-wide coverage, which it is not.[7] The concern in *Grove City* was with attribution of receipts by a part to the whole, not with attribution of receipts by a whole—the research program—to one of its parts—physical education. *See Frazier v. Board of Trustees of the Northwest Mississippi Regional Medical Center*, 765 F.2d 1278, 1291 n. 29 (5th Cir.1985) (§ 504). The Supreme Court in *Grove City* expressly rejected the argument that Title IX forbids discrimination only in the administration of the *federal* financial aid funds and not in the administration of the *entire* financial aid program. *Grove City*, 465 U.S. at 571 n. 21, 104 S.Ct. at 1221. The Court merely disapproved the "ripple effect" theory of determining the scope of Title IX coverage—i.e., a party may no longer argue that discrimination is prohibited in Program A because federal funds for Program B freed general university funds to be shifted to Program A.

Several courts have looked instead to the purpose of Congress in making available the particular federal funds and then found the relevant Title IX "program or activity" to encompass all parts—but only those parts—of the entity in which the monies

*could* have been used. *E.g., Arline v. School Board*, 772 F.2d 759, 763 (11th Cir. 1985) (when federal assistance was nonearmarked and deposited in the school system's general revenue fund, the "program or activity" funded within the meaning of section 504 was the entire school system); *Jacobson v. Delta Airlines*, 742 F.2d 1202, 1211 (9th Cir.1984) (airline's small community service program was the section 504 "program" when federal payments assisted carrier only to the extent it provided service to small communities), *cert. dismissed,* —— U.S. ——, 105 S.Ct. 2129, 85 L.Ed.2d 493 (1985); *Henning v. Village of Mayfield Village*, 610 F.Supp. 17, 19 (N.D.Ohio 1985) (when federal funds were given to Village to use at its discretion, funds did not have to be used by police department in particular year for discrimination by that department to be covered under section 504); *see also Tudyman v. United Airlines*, 608 F.Supp. 739, 742 (C.D.Cal.1984) (court could not grant summary judgment in section 504 action unless convinced that any federal financial assistance provided to the defendant was "for a function or purpose * * entirely unrelated to plaintiff and any or all programs or activities in which plaintiff [was] involved"). *See generally* Note, *supra,* at 1228–32 (legislative history supports position that "program" language of Title IX refers at least in part to the grant statute).

We believe this emphasis on the purpose of the funds is the more appropriate approach in light of the language of the Supreme Court in *Grove City*. For example, the Court emphasized that the federal financial aid to students at issue there was intended to "supplement[ ] the College's own financial aid program," 465 U.S. at 565, 104 S.Ct. at 1217, and to allow the college to "expand [its] financial aid programs and to recruit students who might

---

**7.** The Supreme Court in *Grove City* did not reject institution-wide coverage in general, but only on the facts of the case. 465 U.S. at 570–71, 104 S.Ct. at 1221. The Court seemed to contemplate that nonearmarked grants, for example, would trigger institution-wide coverage. *Id.* at 573, 104 S.Ct. at 1221. *Grove City*, however, does control O'Connor's argument that,

because Peru State used the availability of federal assistance as an athletic recruiting tool, the federal financial aid to students in this case was aid to the athletic program, rather than the financial aid program. As developed *infra,* it is Congress' intent in authorizing the aid that controls.

otherwise be unable to enroll." *Id.* at 571, 104 S.Ct. at 1221; *see also id.* at 573, 104 S.Ct. at 1222. The federal funds, the Court said, were "earmarked" for the college's financial aid program. *Id.* at 571, 104 S.Ct. at 1221. Finally, the Supreme Court concluded that the funds in question "[i]n purpose and effect * * * represent federal financial assistance to the College's own financial aid program, and it is that program that may properly be regulated under Title IX." *Id.* at 573–74, 104 S.Ct. at 1222–23.

Our question here is thus the purpose for which Congress intended that Title III funds be used. The statute itself features an "Enumeration of purposes" including "to improve academic quality," which suggests that "academics" generally will be the "program or activity receiving Federal financial assistance" under Title IX. 20 U.S.C. § 1057(a). Even if it is argued that the purpose of Title III funds is narrowed by the specific projects approved in a college's grant application, we think it clear that "academics" was still the focus of the Peru State funding. Research at Peru State appears to have been not a separate function pursued as an end in itself but instead a method of instruction and a process of learning to which it was desirable that students be exposed. Each academic division was required to establish two re-

search projects, and students were to receive release time from classes and labs to participate. Furthermore, the Title III grant to Peru State included funds also, for example, for curriculum evaluation and development. The program thereby benefited could only have been the academic program, of which physical education is a part.

■ The discriminatory conditions of which O'Connor complains, however, go to her coaching rather than her teaching duties.[8] Even though at Peru State athletics is administratively a part of the physical education division, we do not believe that intercollegiate sports, while important to the higher education experience, constitute "academics" within the contemplation of Title III. The statute lists as special concerns, for example, development of faculty and academic programs, utilization of libraries and laboratories, and acquisition of equipment for academic programs, 20 U.S.C. § 1507(b); athletic competition would not seem to similarly "strengthen [a college's] capacity to make a substantial contribution to the higher education resources of the Nation." *Id.* § 1507(a).

Thus, we agree that Title IX coverage did not extend to Peru State's athletic programs,[9] and we affirm the district court's

8. O'Connor recognizes that, to the degree she relies upon teaching conditions, such as course assignments, her Title IX claim merely duplicates her Title VII claim, and we are bound by the decision thereon in favor of Peru State. We reject, however, Peru State's argument that O'Connor lacks standing under Title IX to challenge, for example, the assignment of the women's basketball team to the less desirable practice court and the lack of fitting uniforms. The facilities and supplies with which a teacher or coach is provided are clearly part of that teacher's conditions of employment and do not become less so because the same factors might also be raised in a discrimination claim by a third party, here the female athletes themselves. Claims of discriminatory employment conditions are cognizable under Title IX. *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982).

9. Because of our decision on Title IX coverage, we need not reach O'Connor's claim that, since she obtained essentially the relief sought when Peru State voluntarily acted to eliminate dispar-

ities between the men's and women's athletic programs, she was entitled to attorney fees as a prevailing party. We observe, however, that the district court may not have made a sufficient factual determination on which to base its legal conclusion on that issue. The district court found only that O'Connor's suit was not *the* "catalyst" for the college's actions because another female coach before O'Connor was hired had requested better equipment and treatment for women's athletic teams and the evidence was insufficient to show that O'Connor's complaints were the "major incentive" for the improvements. *O'Connor,* 605 F.Supp. at 761. Yet it is not necessary that O'Connor's lawsuit have been the *sole* cause—or even the *primary* cause—for Peru State's actions. *United Handicapped Federation v. Andre,* 622 F.2d 342, 346–47 (8th Cir.1980); *see also Charles v. Coleman,* 689 F.2d 774, 776 (8th Cir.1982) (per curiam) (district court's finding that plaintiffs' suit was a factor in consent decree would not be disturbed absent affirmative evidence that the suit had no connection to the relief secured); *Morrison v. Ayoob,* 627 F.2d 669 (3d Cir.1980) (per curiam)

dismissal of O'Connor's claims under that statute and under Title VII and section 1983.

(finding that suit was a material factor in bringing about defendants' compliance was not clearly erroneous even though defendants alleged that an independent order from their superior and an intervening legal decision were the real reasons for their change of course), *cert. denied,* 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981); *Nadeau v. Helgemoe,* 581 F.2d 275 (1st Cir.1978) (district court acted improperly in denying fees on the basis that other suits had been filed on same issue when it failed to make a specific finding that plaintiff's particular suit was superfluous in obtaining improvements from the defendant).

Furthermore, the chronological sequence of events is an important factor in determining the relationship between the suit and compliance, *United Handicapped,* 622 F.2d at 347; and we find it noteworthy that the complaints of the other female coach relied on by the district court were made nearly two years or more prior to the time when O'Connor filed her suit, yet Peru State does not even argue that it began steps to eliminate disparities before the latter date. *Cf. Morrison,* 627 F.2d at 672 (failure of defendants who were aware of complaints to act until after plaintiff filed suit "strongly suggested" that the suit was a material factor in bringing about compliance).