**Mary YOUNG, Plaintiff,**

v.

**CONTROL DATA CORPORATION, Defendant.**

**No. CV 87-0-314.**

United States District Court, D. Nebraska.

Dec. 20, 1989.

Clyde A. Christian, Omaha, Neb., for plaintiff.

Barbara A. Leininger, Minneapolis, Minn. and Harvey B. Cooper, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

RICHARD E. ROBINSON, Senior District Judge.

### I.

### INTRODUCTION.

Plaintiff Mary Young brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, claiming that she was illegally terminated from her position with Control Data Corporation. Although her termination was pursuant to the "progressive discipline system" utilized by Control Data, Ms. Young does not assert that the system was itself discriminatorily applied. Instead, she alleges that in at least two of the four incidents leading up to her discharge she was illegally treated more harshly than her male counterparts. Since the disciplinary system is cumulative in nature, Ms. Young argues, her termination would not have occurred in the absence of unlawful discrimination.

Control Data argues, first, that it did not act with discriminatory intent in any of the four incidents, and that the disciplines were imposed after investigation showed that such steps were in fact warranted. Control Data also argues that its decision to terminate Young was not compelled by the progressive discipline system, but was instead a determination made by the company based on the quality of Young's overall performance, not the quantity of her mistakes.

For reasons noted below the Court finds for the defendant Control Data Corporation on the substantive question of discrimination, having determined that, although Young established a prima facie case of discrimination, Control Data has articulated legitimate, non-discriminatory reasons for its actions, and that Young has failed to show that the explanations advanced by Control Data were pretextual.

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

### II.

### FINDINGS OF FACT.

Mary Young was employed by Control Data Corporation for two separate time periods. She was initially hired on February 26, 1973 and voluntarily resigned, for personal reasons, on October 18, 1974. She was rehired by Control Data on February 2, 1976 and involuntarily terminated on February 7, 1986. It is this latter term of employment that forms the basis of this action.

Ms. Young held several positions at Control Data, all but one obtained as promotions. The other position change was at Young's request and was not a demotion for cause. Young's last position with Control Data, which she held for approximately four and one-half years until her termination, was that of Manufacturing Process Specialist (MPS). That job consisted of such activities as monitoring the setup of

equipment, adding chemicals, making quality checks, troubleshooting equipment problems, operator training and monitoring manufacturing process compliance. Although not a supervisory position, the MPS is responsible for ensuring that products are correctly manufactured.

Until her last six months of employment at Control Data, Young had a generally successful work record, as evidenced both by Control Data's own evaluations of her performance (Exhibits 19, 20 and 21) and by testimony at trial of her immediate supervisor and a co-worker. However, that changed over the next six months, during which time Young was the recipient of four disciplinary actions, resulting in an oral warning, a written warning, suspension, and termination, respectively. Each of those incidents are described below.

*The Disciplinary Incidents.*

1) **The Incident of August 26, 1985.** In this incident (described in Exhibit 1), Young received an oral warning after some 600 computer discs were damaged after being processed despite observed problems with the chemical solution. The loss to the company was estimated at some $4,200. Another Control Data employee, Ed Wallace was also involved, although his role was disputed and he was not disciplined. This incident was investigated by Young's supervisor, Elaine Startzer, and documented with a personnel memorandum acknowledged by Young's signature.

2) **The Incident of November 5, 1985.** In this incident (described in Exhibit 2), Young was given a written warning for failure to create a "down time log", i.e. a written notice that an oven was not working at the required temperature. Young gave oral notice of the problem to another employee and later went home because of illness. Her oral notice was forgotten, and six racks of computer discs were damaged when they were processed in the malfunctioning oven, at an estimated cost of $2,106. This incident was investigated by Startzer, and documented with a personnel record memorandum, which Young refused to sign.

3) **The Incident of November 14, 1985.** In this incident (described in Exhibit 3),

Young was placed on a three-day suspension for placing the wrong chemical into a "clean and etch machine", contaminating the oxide solution and resulting in an estimated cost of $2,800. Again, this incident was investigated and documented by Startzer, and Young acknowledged the personnel file memorandum by her signature.

4) **The Incident of February 11, 1986.** In this incident (described in Exhibit 4), Young was placed on investigatory suspension, and ultimately terminated, for placing the wrong temperature charts in the ovens. There is no evidence of monetary loss from this incident.

Young's disciplines were administered in compliance with Control Data's "Approved Policy and Procedure on Disciplinary Actions", guidelines for imposition of discipline upon employees. Exhibit 12. Although this policy provides, *inter alia,* that a progressive approach "should" be utilized, *Id.* at 1, it also allows for exceptions to that approach. *Id.* ("In those situations when a single offense or incident is serious enough, immediate suspension is warranted").

Because Young had more than eight years of service with Control Data, the company was, by its own guidelines, required to follow a three-stage approval process prior to termination. Exhibit 13. These stages were followed. The Omaha Personnel Manager, Mike Boyd, wrote his superior, the then-Personnel Manager for Technology and Engineering Operations B.C. Bjerke, requesting approval of the termination (Exhibit 6); Bjerke then contacted his superior, the then-Vice President of Personnel J.P. Gougoutris, requesting approval (Exhibit 11); the termination was ultimately approved by the then-Vice President of Technology and Engineering Operations, D.C. Bowman.

Following these approvals, Mary Young was terminated by Control Data on March 7, 1986.

### III.

### CONCLUSIONS OF LAW.

The procedural and evidentiary framework for a Title VII action is well-estab-

lished. *See, e.g. O'Connor v. Peru State College,* 781 F.2d 632, 636 (8th Cir.1986):

> Formal statements of the pattern and burden of proof in discriminatory discharge cases set out three steps: 1) the plaintiff must establish a "prima facie case", that is, facts sufficient to give rise to an inference that the termination was motivated by discrimination; 2) the employer then must articulate an alternate legitimate reason for the discharge sufficient to dispel the unfavorable inference; and 3) the plaintiff may attempt to show that the reason articulated by the employer was improperly motivated.

(citations omitted). As will be explained below, the Court finds that Young did succeed in establishing a prima facie case, but finds for Control Data in that Young has failed to show that Control Data's proffered legitimate, non-discriminatory reasons for its actions were pretextual. "Once the factfinder has determined that the employer's reasons were not a pretext for illegal discrimination, there is no basis for a Title VII claim." *O'Connor v. Peru State College, supra,* at 638.

A. The Prima Facie Case.

Control Data moved for a directed verdict at the close of Young's case-in-chief, contending that Young had failed to establish a prima facie case; the Court reserved ruling on the motion. Control Data renewed its motion at the end of trial, and the Court again reserved ruling.

The Court now overrules both motions for a directed verdict. Such a verdict is not warranted for two reasons. The first is that Young has met the relatively low threshold of a prima facie case, which is merely to create "a presumption that the employer unlawfully discriminated against the employee." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 216 (1981). The second reason is that establishment of a prima facie case is not critical once all the elements for resolution of the issue of discrimination have been placed before the Court. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403, 409–11 (1983); *Estes v. Dick Smith Ford,* 856 F.2d 1097, 1100 (8th Cir.1988).

1. *The Threshold For a Prima Facie Case.*

The basic prima facie case format was set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973). In *McDonnell Douglas,* a wrongful discharge case, the Court held that a plaintiff must first establish:

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications he was rejected; and (iv) that, after his rejection, the employer continued to seek applications from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677. It has long been established, however, that the model is to be flexibly applied. *See Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 966–67 (1978) (holding that "the method suggested in *McDonnell Douglas* was never intended to be rigid, mechanized or ritualistic").

In the Eighth Circuit a prima facie case for discriminatory discharge has been set out as the establishment that the plaintiff (i) was a member of a protected minority, (ii) was demonstrably capable of performing his employment duties, and (iii) that the defendant sought people with the plaintiff's qualifications to fill his job. *Osborne v. Cleland,* 620 F.2d 195, 197–98 (8th Cir. 1980). Under this formulation, the gender of the new hire is irrelevant. "The race or sex of the replacement for the plaintiff, if any, may be properly and adequately dealt with during rebuttal and showing of pretext." 3 A. Larson and L. Larson, *Employment Discrimination,* Sec. 86.40 (1989).

In *Loeffler v. Carlin,* 780 F.2d 1365 (8th Cir.1985), *rev'd on other grounds,* 486 U.S. 549, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988), a case in which the plaintiff claimed to be the victim of a discriminatorily-applied dis-

**1328**

ciplinary system, the Eighth Circuit held that a prima facie case had been established when the male plaintiff showed that (i) all employees had similar status with regard to the rule in question; (ii) that plaintiff and two female co-workers had openly violated the rule; and (iii) that the plaintiff was ultimately discharged for his actions, while neither of the two female co-workers was as severely disciplined. *Id.* at 1369.

2. *Young Has Met This Threshold.*

■ At the close of Young's argument, Control Data moved for a directed verdict, contending that she had failed to establish a prima facie case. Specifically, Control Data contends Young fails because (1) her job was filled by another woman, which falls short of the original standard set out in *McDonnell Douglas, supra,* and (2) she failed to show that she was qualified for the position.

The gender of Ms. Young's replacement is clearly irrelevant. As noted earlier, the *McDonnell Douglas* criteria were never intended to be inflexibly applied, and have been formulated by the Eighth Circuit in a manner that allocates the status of the replacement to the pretext phase of the trial. *Osborne, supra; See also U.S. Equal Opportunity Commission v. Minneapolis Electric Steel Casting Co.,* 552 F.Supp. 957, 964 (D.Minn.1982): "The ultimate issue is whether the defendant discriminated against a particular employee.... The fact that a discharged woman is replaced by a woman does not prevent a showing of discrimination under Title VII...."

The issue of Young's qualifications presents a more troublesome challenge. It is clearly relevant in a discriminatory discharge action, *Osborne, supra,* and at least by implication in discriminatory discharge cases. *See Boner v. Board of Commissioners of Little Rock Municipal Waterworks,* 674 F.2d 693, 695 (8th Cir.1982) (affirming a district court's dismissal for lack of a prima facie case and noting that "[e]mployees are not similarly situated for purposes of disparate treatment analysis when ... the facts establish that one is qualified to perform job tasks competently and the other is not").

Ms. Young has presented evidence that she was qualified for the position, including "Performance Appraisal Reports" for 1983 (Exhibit 19), 1984 (Exhibit 20), and 1985 (Exhibit 21), each of which indicates a general approval of her performance. She also adduced, on direct examination, a favorable evaluation of her work by Robert Eaton, a fellow MPS, and adduced, on cross-examination, an admission that she was generally qualified, from Elaine Startzer, her supervisor.

Control Data has vigorously asserted that Young was not qualified for the MPS position, citing the fact that she had received four disciplinary measures in a seven-month period of time. Post Trial Brief of Control Data at 4–5. There is precedent to the effect that merely having held a job for a number of years does *not* warrant a presumption of qualification at the time of termination. *See Agarwal v. Regents of the University of Minnesota,* 788 F.2d 504, 509 (8th Cir.1986) (affirming a district court finding of no discrimination and noting that "[the fact] he held his position for fifteen years before he was terminated for incompetence does not prove that he performed his duties competently during his period of employment or that he was competent when he was dismissed"). *See also Physicians Mutual Insurance Co. v. Scott,* 231 Neb. 947, 955, 439 N.W.2d 72, 78 (1989) (noting that "her poor performance prior her discharge is crucial and makes irrelevant her earlier qualifications for the position").

There is obviously some doubt as to whether Young has sufficiently established that she was qualified for the job at the time of her discharge. However, in view of the fact that "[t]he burden of establishing a prima facie case is not onerous," *Burdine* 450 U.S. at 253, 101 S.Ct. at 1094, and in view of the fact that there it would be somewhat circular to allow Control Data to prove Ms. Young's lack of qualification via memoranda of its own determinations, when the objectivity of those determinations is at issue, the Court finds that Ms.

Young has sufficiently satisfied this element of her prima facie case. Moreover, as discussed immediately below, there is another reason for deciding this case on its merits.

3.  *Once A Title VII Action is Heard on the Merits, the Validity of a Prima Facie Case is No Longer Critical.*

The procedural framework in a Title VII action is nothing more than "a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination", *Furnco*, 438 U.S. at 577, 98 S.Ct. at 2949, 57 L.Ed.2d at 967, and the prima facie case ought not be considered as a crucial "case-within-a-case which a plaintiff must win conclusively...." *Estes v. Dick Smith Ford*, 856 F.2d 1097, 1100 (8th Cir.1988).

Once a case has been heard on the merits, there is no reason to further consider the prima facie case. *See United States Postal Service Board of Governors*, 460 U.S. at 714–15, 103 S.Ct. at 1481–82, 75 L.Ed.2d at 410:

> [W]hen the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for plaintiff's rejection, the factfinder must then decide whether the rejection was discriminatory within the meaning of Title VII. At this stage the *McDonnell–Burdine* presumption drops from the case....

*See also Estes v. Dick Smith Ford*, 856 F.2d at 1100: "Once the parties have developed the record on all stages of the *McDonnell Douglas* analysis, whether plaintiff makes a prima facie case is no longer relevant. What is relevant, at this point, is whether the plaintiff's evidence permits a reasonable inference of discrimination."

Since, in the instant case, all relevant evidence is before the Court, it would be inappropriate to grant Control Data's motion for a directed verdict. The Court therefore denies the motion, and will now look to the substantive issue of alleged proscribed discrimination on the part of Control Data.

B.  Defendant Control Data's Articulation of Legitimate Non–Discriminatory Reasons for Its Actions.

Once a plaintiff has met the prima facie case requirement the burden shifts to the defendant, who must then articulate "some legitimate, nondiscriminatory reason" for the challenged actions. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677–78; *O'Connor v. Peru State College*, 781 F.2d at 636. This is, however, a burden of production, not persuasion:

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reason for its action.

*Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95, 67 L.Ed.2d at 216.

*See also Chambers v. Omaha Girls Club*, 629 F.Supp. 925, 947 (D.Neb.1986), *aff'd* 834 F.2d 697 (8th Cir.1987) (noting that "[d]efendant's burden is not a heavy one. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff").

Control Data has met this burden. It has presented evidence of four incidents for which Young was determined to be responsible (Exhibits 1–4), incidents which cost the company in excess of $9,000. Control Data has also presented evidence that the decision to terminate Young was made as the result of her worth to the company, as weighed against her alleged mistakes. *See* Exhibit 6, the interoffice memorandum recommending her termination:

> [W]e are recommending termination as opposed to downgrade because of the nature of the problem, the cost of her errors, and the fact that there is no reason to suspect other disciplinary action such as further suspension or downgrade, would be solutions to the problem.

*Id.* at 2.

Young has challenged the premises underlying this decision to terminate her, as-

serting that in three of the incidents she was either unjustly accused or that she was unfairly singled out from one or more equally responsible individuals. That challenge will be addressed below; at this stage of analysis, it is sufficient to state that Control Data has met its burden of articulation.

C. Young's Attempt to Show that Control Data's Articulated Reasons Are Pretextual.

Once a defendant has articulated a reasonable nondiscriminatory reason for its actions, the burden shifts once more to the plaintiff, who must prove that the proffered reasons are intended to conceal a proscribed discriminatory motive. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *O'Connor v. Peru State College*, 781 F.2d at 636; *E.E.O.C. v. M.D. Pneumatics*, 44 F.E.P. 521, 528 (W.D.Mo.1984), *rev'd and remanded on other grounds*, 779 F.2d 21 (8th Cir.1985) (holding that when a defendant has met the articulation standard, "the plaintiff must prove by a preponderance of the evidence that the stated reason is merely pretext").

A plaintiff's evidence must consist of more than a mere denial of defendant's proffered reasons. "[A] plaintiff must take the extra step of presenting evidence to show that the reasons given are an attempt to cover up the employer's alleged real discriminatory motive." *Irvin v. Airco Carbide*, 837 F.2d 724, 726 (6th Cir. 1987); *Cf. O'Connor v. Peru State College*, 781 F.2d at 636: "At this point we are concerned only with the ultimate issue in the case—which party's explanation of the employer's motives are to be believed." The plaintiff retains the ultimate burden of proof, and may meet that burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Young has failed to carry this burden, for reasons to be explained below.

1. *The Role of Control Data's Progressive Discipline System.*

Young argues, first, that Control Data improperly used its progressive discipline system to mask a discriminatory intent to discharge her. *See* Plaintiff's Trial Brief at 5–6: "[E]mployers do not ordinarily discipline employees without *some* good reason. Thus, if an untrue allegation against an otherwise good employee causes the employee to be fired, then the Court will draw the discriminatory inference." (Emphasis in original). In effect, Young is arguing that Control Data utilized the cumulative impact of the system to compel Young's discharge for an incident that would otherwise result in a lesser penalty:

> The final incident or recommendation for termination ... could not legally occur unless the initial three incidents occurred and evidence was adduced by Defendant showing that each discipline were [sic] issued in a non-discriminatory manner.... [I]f one specific part or one specific incident in the termination process is ... in violation of Title VII, the actual discharge of plaintiff is vitiated.

Plaintiff's Post–Trial Brief at 1.

This argument must fail, resting as it does on the implicit—and erroneous—assumption that Young was terminated only as the ultimate and inevitable final step in a rigidly followed process. The facts are otherwise.

There are indications that Control Data did follow this progressive policy in its discipline of Young. See, e.g. Exhibit 5, a letter from Personnel Manager M.A. Boyd to Young: "It is our finding that a process of progressive treatment was followed....". *See also* Exhibits 6 (inter-office memorandum from M.A. Boyd to B.C. Bjerke) and 11 (inter-office memorandum from B.C. Gjerke to J.P. Gougoutris) (both describing progressive discipline).

But there are also indications that Control Data was not constrained to follow this policy inflexibly. Examination of the memorandum by Elaine Startzer, Young's supervisor, describing the decision to terminate Young, Exhibit 4, clearly demonstrates this flexibility: "We had to deter-

mine whether to downgrade ... or go with a more severe suspension or termination of employment." Lyle Epperson, the Control Data area manager who supervised Young and Startzer also testified at trial that the disciplinary system was intended as, and considered to be, a set of guidelines rather than a rigid formula.

This Court is persuaded that the "progressive discipline policy" utilized by Control Data was one that authorized, but did not compel, termination of Ms. Young—or any other employee—upon the receipt any set number of disciplinary actions.

It is clearly established that Control Data's disciplinary process was intended to be, and was utilized as, a flexible set of guidelines, and that the decision to terminate Young was made on the basis of a qualitative, not quantitative, assessment of her performance. Any effort by Young to establish pretext must, therefore, be based upon the individual incidents in question, and not upon their alleged role in the progressive discipline system.

### 2. Young's Assertion of Pretext: Disparate Discipline.

Young argues strenuously that she was the victim of disparate administration of discipline in the November 11, 1985 incident, described in Exhibit 2, involving her failure to create a "down-time log", e.g. an official written notification that the oven was malfunctioning. Plaintiff's Post–Trial Brief at 7–11. In that incident, Young was an MPS on duty at the beginning of the shift; Robert Eaton was another MPS on duty. Young learned that Oven # 12 was malfunctioning, and orally told the Oven–Tender of the problem. Exhibit 12. The Oven–Tender later forgot or otherwise disregarded Young's oral instructions, and loaded the oven, resulting in damage to materials being processed. *Id.* Young received a written warning for her actions; Eaton, the other MPS, did not.

Young argues that to discipline her, and not Eaton, was a proscribed discriminatory action. This argument must fail, for two reasons. First, in order to prove discrimination by this argument, a plaintiff must establish that the employee who received

more lenient treatment was "similarly situated in all respects." *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir. 1985); *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096. Young's supervisor, Elaine Startzer, testified that Young was written up, and Eaton was not, because it was the MPS who first discovered a problem, Young in this instance, who bore the responsibility of creating a down-time log. Eaton was not disciplined because he had no responsibility of creating the log. "What is relevant ... is that two employees are involved in or accused of *the same offense* and are disciplined in different ways." *Boner v. Board of Commissioners of Little Rock Municipal Water Works*, 674 F.2d at 697 (emphasis added).

Young makes a similar argument in two other incidents. In the incident of August 26, 1985 (described in Exhibit 1), Young received a verbal warning while an employee working under her supervision was not disciplined. Young again argues that this is disparate treatment; again, this argument is inapposite, since the two were not similarly situated. And in the incident of February 11, 1986 (described in Exhibit 4), Young was disciplined for placing the wrong temperature charts in the ovens, while another employee, Dewayne Bottom—who was being retrained as an MPS after an absence of some two years—was not disciplined. However, it was established at trial that Control Data considered Bottom to be a trainee, and not a qualified MPS. Therefore, the two were not similarly situated. *Cf. Cooper v. City of North Olmsted*, 795 F.2d 1265 (6th Cir.1986) (holding it improper to compare a probationary employee and a non-probationary employee).

Moreover, even where two employees are shown to be similarly situated, the mere fact that one is treated differently does not, of itself, prove discrimination. *See Osborne v. Cleland*, 620 F.2d at 198–99:

When race [or sex] is not shown to have been a factor, and discharge is an action authorized, but not compelled, a Title VII plaintiff does not meet the burden of proof by showing other employees who

acted similarly were not discharged.... Without proof that the real motive was racial [or sexual] discrimination, the inconsistent and harsh character of [an employer's] action ... does not suffice to show violation of Title VII.

*Cf. Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 606 (8th Cir.1983): "Although the company's highly subjective discipline policy ... left enforcement to the discretion of the supervisors, this does not establish ... discrimination.

3. *Young's Assertion of Pretext: Challenging Control Data's Determination of her Culpability in the Disciplinary Incidents.*

Young has also challenged Control Data's proffered explanation by disputing the company's version of her role in three of the four precipitating incidents. This argument must be examined from the perspective that employers are required to make reasonable, not perfect, determinations in such incidents. *See O'Connor v. Peru State College*, 781 F.2d at 638: "Courts may not interfere with honest business judgments just because they consider them unfair or misguided"; *See also Pugh v. See's Candies, Inc.*, 116 Cal. App.3d 311, 330, 171 Cal.Rptr. 917 (1981), *on retrial* 203 Cal.App.3d 743, 250 Cal.Rptr. 195 (1988) (holding that "[c]are must be taken ... not to interfere with the legitimate exercise of managerial discretion.... [T]he employer must of necessity be allowed substantial scope for the exercise of subjective judgment").

In the incident of August 26, 1985 (Exhibit 1), involving damage to discs when they were sent through a chemical process that Young knew was defective, Young argued at trial that she was not at fault because another employee had sent the discs through against her express orders, during the time that Young was attempting to contact her supervisor, Elaine Startzer, for advice. Control Data disputed this version of the incident, and presented evidence indicating that the processing system could not have been started and completed during the few minutes it would have taken

for Young to contact Startzer and return to her post.

In the incident of November 5, 1985 (Exhibit 2), involving Young's failure to create a "down-time log", Young argued that because she had gone home prior to the actual damage having occurred, she should not have been held responsible. Control Data disputed this conclusion, and contended that the significant error occurred when she failed, as the MPS who discovered the problem, to make the log at that time. And in the incident of February 11, 1986, Young argued that placing the wrong charts in the ovens was an understandable and insignificant mistake; Control Data argued that it was a serious error, and that Young had created the problem by failing to wear her bifocal glasses. Post–Trial Brief of Control Data at 11–12.

Analysis of these incidents indicates that Young has, at most, suggested that reasonable minds may have interpreted events differently. Such a suggestion establishes neither pretext nor discriminatory motive. "In a case involving discrepancies between an employer's articulated reasons for a personnel decision and fact, fairness, and good sense, the real issue is whether such discrepancies are truly the product of error or the exercise of judgment with which others might differ or whether the discrepancies are the product of makeweight rationalization which may signal the presence of improper motives." *O'Connor v. Peru State*, 781 F.2d at 638, n. 3. Finding no indication that Control Data's explanations for its actions were neither "makeweight rationalizations" nor otherwise improper, the Court finds that Young has failed to prove pretext.

## IV.

## CONCLUSION.

After careful consideration the Court finds that Mary Young has failed to prove that she was the subject of proscribed discriminatory actions by the Control Data Corporation. The Court finds that Young did succeed in establishing a prima facie case, but that Control Data successfully articulated legitimate, non-discriminatory

reasons for its action, and that Young failed in her efforts to prove that those reasons were merely pretextual. Accordingly, the Court concludes that Control Data's actions were not in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* An appropriate Order and Judgment will be entered in conformity with this Memorandum Opinion.

### ORDER AND JUDGMENT

Pursuant to the Memorandum Opinion filed this date in the above-captioned case, the Court concludes and finds that plaintiff Mary Young has failed to establish a claim of discrimination under Title VII, 42 U.S.C. § 2000e *et seq.*, and, therefore, judgment should be entered in favor of the defendant Control Data Corporation and against the plaintiff on that claim.

IT IS SO ORDERED.