**Louis ANDRIAKOS, Plaintiff,**

v.

**The UNIVERSITY OF SOUTHERN INDIANA, the Board of Trustees of the University of Southern Indiana, Gail Franks, Margaret (Peggy) Graul, Nadine Coudret and Robert L. Reid, Defendants.**

**No. EV 91–153–C.**

United States District Court,
S.D. Indiana,
Evansville Division.

Sept. 23, 1992.

E. Dean Singleton, Owensville, IN, for Louis Andriakos.

Thomas O. Magan, Kahn Dees Donovan & Kahn, Evansville, IN, for University of Southern Ind., University of Southern Ind. Bd. of Trustees, Gail Franks, Margaret (Peggy) Graul, Nadine Coudret, Robert L. Reid.

## MEMORANDUM

BROOKS, Chief Judge.

This matter comes before the Court on Defendants' Motion for Summary Judgment against Louis Andriakos on the final basis of his complaint, the Title IX claim.

### FINDINGS OF FACT

1. Andriakos was a nursing student at the University of Southern Indiana from August 1988 to March 1991.

2. During the spring of the academic year 1989–90, Andriakos took Nursing N242, Health Patterns of Children, taught by Gail Franks, R.N.

3. In evaluating the plaintiff's clinical performance, Franks documented on several occasions his failure to demonstrate safe clinical nursing practices.

4. Franks stated in paragraph 4 of her affidavit, "[d]uring Mr. Andriakos's clinical rotation, I observed the following unprofessional and unsafe practices:

(a) On March 21, 22 and 23, 1990 Mr. Andriakos arrived on the clinical unit with his uniform soiled and unshaven. The note documenting Louis' failure to meet the minimal standards for clinical practice is attached hereto as Exhibit 'A.'

(b) On April 4 and 5, 1990 I evaluated Mr. Andriakos and told him he needed to work more on communicating with clients, their families, and the health team members. For example, when I asked Louis to make a nursing assessment of how a child's parents related to the child, Louis replied, 'You're not going to like this but they fit my image of what two eastern Kentucky coal miners are like.' This was not new behavior for Louis nor was it the first time that he was advised of his judgmental behavior. Furthermore, and more important, Louis's clinical practice was unsafe. Louis had prepared the incorrect dosage of medication. I asked Louis 'do you have the correct amount of medication in the syringe?' Louis said 'yes.' I pointed out to Louis that he had 2cc of air in the syringe and squirted out the air. Then he recognized that he had the wrong amount (3cc's, instead of 5cc's) and prepared the correct dose. My clinical evaluation of Louis on April 4 and 5, 1990 is attached hereto as Exhibit 'B.'

(c) On April 10, 1990 I gave Mr. Andriakos his midterm evaluation and again explained that he needed to improve his communication with patients and discuss client care in terms of nursing. Louis' midterm evaluation is attached hereto as Exhibit 'C'.

(d) On April 11, 1990 Louis failed to adjust for the decimal placement when figuring the safe range of medication for a patient. After Louis corrected the dosage he prepared the liquid medication in the syringe and laid it on the counter. He left the room for approximately 15 minutes and when he returned he picked up the syringe. I asked him how he knew that was the same syringe he had left on the counter before he left the room. I pointed out that he had been gone for 15 minutes and that it was unsafe to assume that medication was the same medication he had left. I told Louis he should have place [sic] the syringe in the patient's medication drawer or carried it with him. My clinical evaluation of Louis is attached hereto as Exhibit 'D.'

(e) On May 2, 3 and 4, 1990 Louis again failed to synthesize scientific concepts which resulted in errors during client care. My clinical evaluation of Louis is attached hereto as Exhibit 'E'."

5. In Franks' clinical evaluation of Andriakos on 4–5 April 1990 (Exhibit B of Franks' affidavit), she noted,

Inappropriate use of clinical time. This is a persistent behavior from conference of 3/26/90. Again this is reflective of Louis' unwillingness to accept direction and his determination to do things his way. While caring for a one and a half year old boy, Louis justified leaving him crying in bed and refusing to keep him in the play room because, "he couldn't spend his entire day

in a play room ..." When questioned how he had plan to spend the remainder of the morning with this client, he admitted to not having anything planned for this child. He failed to recognize play as an appropriate use of his time. His action of leaving the child crying in his crib was punitive treatment for this client.

6. In Franks' clinical evaluation of Andriakos on 11 April 1990 (Exhibit D of Franks' affidavit), she noted,

In figuring the safe range of one med he did not adjust for decimal placement. For his child's wieght [sic] of 7.2 kg, what should have been 2.16mg to 4.32mg he figured as 21.6mg and 43.2mg. He had divided this into 7.2mg–1.10mg. I pointed out the mistake in math and had him redo this. Then he converted these rang in to ml. I asked him how much the physician had ordered. He read from the MAR and said 1ml. Asked again and he said 1ml. On the third try he read the correct dose of 1.5ml....

I suggested to Louis that he might need to have his eyes examined since this was the second time he had misread the MAR and the writing was legible.

Louis documented on the MAR that he gave both drugs at 0800 when in fact he had given the meds at 0850. I took the MAR to him and asked him to correct it and he said, "I knew you were going to do that. On 4600 they made me record the meds at the times noted on the MAR. I told Louis that this was not the way that he had been instructed to document drugs correctly in practice and why it might be important to show exact times of administration in children, some specific conditions, and with some specific drugs such as insulin. His reply was that he would do it my way. He ignores the obvious, that there is a correct way.

7. In Franks' clinical evaluation of Andriakos on 2–4 April 1990 (Exhibit E of Franks' affidavit), she noted,

Louis was directed to have the instructor assist him when the child returned to his room from physical therapy in getting the child back into bed. He did not do this and when I entered the room the child was leaning against the foot of the bed, standing on his right leg for support. Louis was unable to identify a means of having the child return to bed from that position, and all the while the child was growing more anxious about the possibility of falling. Louis was instructed on the correct procedure of moving a client from bed to chair and chair to bed.

8. Clinical coordinator Melissa Vandeveer, R.N. observed Andriakos during his clinical rotation in Nursing N242 during the spring of the academic year 1989–90.

9. In Vandeveer's clinical evaluation of Andriakos on 18–19 April 1990 (Exhibit A of Vandeveer's affidavit), she noted,

Specifically, Louis taught an eleven year old boy with diabetes that by cleansing the insulin vial with alcohol he could prevent throat infections. When questioned by the instructor Louis said that he thought that his teaching was correct. He said that if the needle hit a vein/artery then the child could get a throat infection. When further questioned about the body's immune response he had incorrect data base.

.     .     .     .     .

While Louis did, at times, identify interventions appropriate to the pediatric patient (discussed baseball player with diabetes with patient, identified a 4 year old unsafely jumping up and down in bed) his overall inability to identify and prioritize nursing diagnoses specific to patient pattern disturbances, his lack of scientific evidence upon which to practice coupled with the fact that he does not seek assistance appropriately make his practice unsafe on April 18, 19, 1990.

10. Franks and Vandeveer issued a final clinical evaluation of Andriakos on 4 May 1990 (Exhibit F of Franks' affidavit, Exhibit B of Vandeveer's affidavit). They concluded,

Louis did demonstrate knowledge of physiological assessments and some interventions, and at times interacted appropriately in a caring manner. He was consistently punctual and attempted to be thorough in planning care. However, his overall inability to synthesize knowledge specific to indi-

vidual patient pattern disturbances, his lack of scientific evidence upon which to practice coupled with inadequate insights into his need for assistance and lack of collaboration make his practice unsafe. During this clinical rotation observations were made by two clinical instructors who concur regarding this evaluation.

11. Andriakos received a failing grade in the clinical component of Nursing N242 during the spring of the academic year 1989–90.

12. The "School of Nursing Student Handbook" states in part, "[s]tudents who do not receive a 'pass' grade in the clinical will receive a letter grade of 'F' in the course. A student who receives an 'F' grade in a nursing course because of a clinical failure will be dismissed from the program."

13. After petitioning Dean Nadine Coudret, R.N., Ed.D., Andriakos was permitted to continue in the nursing program and to re-enroll in N242 the following year.

14. During the spring of the academic year 1990–91, Andriakos took Nursing N242, Health Patterns of Children, taught by Peggy Graul, R.N.

15. In evaluating the plaintiff's clinical performance, Graul documented on several occasions his failure to demonstrate safe clinical nursing practices.

16. Graul stated in paragraph 5 of her affidavit, "[i]n my professional judgment, Mr. Andriakos did not meet the standards required for passing the clinical component of Nursing N242."

17. In Graul's final clinical evaluation of Andriakos on 28 February 1991 (Exhibit A of Graul's affidavit), she noted concerning his "unsatisfactory application of knowledge,"

1/31/91 (Clinical Week 2) Louis was unable to identify the presence of retractions in a 7 month old child with a respiratory disease after having the material in class and viewing a film emphasizing retraction in an infant the week before and passing a test on the material two days before. Louis told the instructor that he did not know what he was supposed to be looking for. He said that he did not know what it meant when the instructor raised the child's gown and told him to "look at the child's chest." While students in the second week of clinical are continuing to add to their assessment skills, faculty would expect a student to recognized the importance of observing the movement of the chest and seeking information regarding abnormalities.

2/7/91 (Clinical Week 3) Louis was unable to describe a rash or identify the location of the abnormal lesions after the instructor guided skin inspection two times on the same patient. He did not identify the location of the rash in the same location as the instructor. He did not identify the location of the rash on the child after the mother called it to the attention of the instructor and the student together. He was unable to chart the observations after a 45 minute discussion with the faculty regarding location and terminology. The faculty had to complete his work by charting the rash because of his difficulty with the proper terminology as well as the location.

Proper terminology of rashes is reviewed in the fundamentals course during the freshman year. This material is also available in the pediatric textbook specific to this patient's disease process.

2/13/91 (Clinical Week 4) He was unable to describe the proper method of identifying the location for injection. When the instructor first asked Louis about the injection location his response was "I'm going to give it in the tush". The instructor asked him for a more precise and safe description. He remained unable to plan for this procedure when guided by the instructor and when using a handout with diagrams. He was unable to differentiate the lateral and posterior view of the buttocks in the picture.

This material is required learning in the first year and reinforced in every course. In N–242 a "skills day" regarding various nursing activities was provided prior to clinical practice with patients. The importance of proper injection technique was emphasized and a demonstration was done relative to injection into the vastus lateralis. A handout was given regarding other

injection sites. This student attended that skills day.

Potential unsafe nursing action is possible if the student is unaware of proper injection sites, and is unable to problem solve when lacking information. An improperly administered injection could result in damage to the sciatic nerve and/or bolus delivery of medication into the femoral artery.

18. In Graul's final clinical evaluation of Andriakos on 28 February 1991 (Exhibit A of Graul's affidavit), she noted concerning his failure to demonstrate "competence in nursing process in the clinical setting."

1/30/91 (Clinical week 2) In discussing the necessary assessment of an infected scalp IV Louis indicated that possible dangers included the possibility that "fluid would get in to the brain". The instructor would expect a student to respond in terms of skin integrity (edema, erythema, sloughing). He related this patient's situation to a previous patient who had leaking cerebral-spinal fluid from a brain injury. This application of knowledge prevents accurate assessment and planing for care....

2/7/91 (Clinical week 3) Louis was guided by the instructor that the most age-appropriate method to administer oral liquid medication to a four year old was in a medicine cup. Louis suggested that a syringe was better. The instructor would expect the student to evaluate that a four year old is frightened of "shots" and will see the syringe even without a needle as a "shot".... Nursing of children requires an understanding of the developmental stages of children in order to provide the child with the least traumatic environment possible. The knowledge of fears of a four year old, particularly a four year old in the hospital, are basic to competent practice.

2/20/91 (Clinical week 5) In caring for a patient who was ambulatory following shoulder surgery, Louis applied scientific base appropriate for a totally immobilized patient such as a stroke patient to his patient who was ambulatory following shoulder surgery. The nursing measures he told the faculty that he implemented with the patient included the recommendation for increased fluid intake to prevent urinary tract infection, and teaching regarding constipation. This patient did not have a nursing diagnosis nor a related medical diagnosis that warranted this action. He indicated to the instructor the pages in the book he was using to plan for this patient's care. The application of information was totally inappropriate.

On this same patient that Louis was treating for complete immobilization he provided instruction regarding "safe weight training, a gradual exercise program and adjustment of the shoulder sling". This instruction was done without a doctor's order. Changes in activity are medically directed by a surgeon following surgery. These nursing actions were also done without faculty guidance as Louis first informed faculty of his actions at the end of the morning. As a result he provided instruction to a patient that was not based in nursing practice, was not timely for the needs of the patient, and was not in compliance with a medical plan of care. Louis stated in his written teaching plan "The main problem was trying to anticipate the doctor's orders." Possible physical injury to the patient from Louis' instruction includes damage to a recent surgical site (shoulder). Further, the patient was unduly treated by Louis for potential urinary tract infection and constipation.

2/21/91 (Clinical week 5) Louis cared for a patient with the medical diagnosis of croup and a nursing diagnosis of altered respiratory status or respiratory distress or ineffective airway clearance. When preparing his charting for faculty review he first wrote "mild cold" the faculty said that was incorrect. He then suggested "allergic rhinitis", again he was told that this was not correct. His next suggestion was laryngotracheobronchitis. Louis had time to plan his charting in between suggestions but was not able to identify any nursing diagnosis without direct and specific guidance from the instructor. The faculty would expect a student to have varying levels of understanding relative to several nursing diagnosis but not to confuse medical diagnoses with nursing diagnosis.

## Summary B

In addition to inadequate clinical practice, written nursing care plans indicate inadequate understanding. Weekly care plans show improvement only after precise and specific guidance from the instructor. Data, diagnoses and etiologies are often incomplete and/or missed. Written nursing care plans are now mandated by JCAH standards and are a part of the permanent chart and are essential part of nursing practice. The written teaching plan indicated an inappropriate nursing plan of care.

19. In Graul's final clinical evaluation of Andriakos on 28 February 1991 (Exhibit A of Graul's affidavit), she noted concerning his failure to demonstrate "accountability and responsibility for own nursing practice,"

Louis had to be instructed to have clean clothes, to shave and to comb his hair.

20. In Graul's final clinical evaluation of Andriakos on 28 February 1991 (Exhibit A of Graul's affidavit), she stated,

## Final Summary

Louis does not evidence safe nursing practice in the clinical setting. In the preceding narrative are examples of practice decisions that place the patient at risk. His inability to apply knowledge essential to nursing, to understand the limits of nursing practice, and to communicate effectively are evidence of unsafe practice. Louis does not meet the standards required for N242 clinical practice and therefore receives a failing grade for the course.

21. Andriakos received a failing grade in the clinical component of Nursing N242 during the spring of the academic year 1990–91.

22. Andriakos filed a formal written grievance regarding his failing grade and on 22 August 1991 the Student Academic Grievance Committee concluded that "faculty members, Mrs. Franks and Ms. Graul, did act in a professional manner in assigning a No Pass grade to Mr. Andriakos." The committee stated, "[b]ased on the written information submitted to the committee; in particular the Clinical Student Self–Evaluation Forms from Nursing N242, the committee feels adequate warning was given to Mr. Andriakos by Ms. Graul as to his failure to demonstrate safe clinical practice."

## TITLE IX SUBSTANTIVE STANDARDS

Defendants argue that "in Title IX substantive disputes, the courts have looked to their interpretation of Title VII for guidance." Defendants' Brief at 6. Andriakos answers that "it would not appear that Title VII standards are necessarily applicable here." Though Andriakos is correct that the application of Title VII standards is not mandated in this Circuit, he fails to present this court with an alternative standard for the resolution of this dispute. Despite the split in the circuits on this point, the prevailing standard seems to favor applying Title VII standards in Title IX cases. *See Mabry v. State Bd. of Comm. Colleges,* 813 F.2d 311, 316 n. 6 (10th Cir.1987) ("Because Title VII prohibits the identical conduct prohibited by title IX, i.e., sex discrimination, we regard it as the most appropriate analogue when defining Title IX's substantive standards ..."); *Cf. Lipsett v. University of Puerto Rico,* 864 F.2d 881 (1st Cir.1988) (Holding explicitly limited to employment claims under Title IX.); *Cf. O'Connor v. Peru State College,* 781 F.2d 632, 642 n. 8 (8th Cir.1986) ("[H]er Title IX claim merely duplicates her Title VII claim, and we are bound by the decision thereon in favor of Peru State."); *But see Franklin v. Gwinnett County Public Schools,* 911 F.2d 617, 622 (11th Cir.1990) ("We do not believe applying Title VII to Title IX would result in the kind of orderly analysis so necessary in this confusing area of the law."). Therefore the Seventh Circuit's Title VII standards will be applied in this Title IX case.

## TITLE VII STANDARDS

Though obviously some modification is necessary for the application of the Title VII standards to this Title IX case, the Title VII standards are clearly presented in *Karazanos v. Navistar Int'l Transp.,* 948 F.2d 332 (7th Cir.1991).

The employee must first establish a prima facie case of discrimination. The prima facie case has four elements. The employee must show: (1) he was in the protected

class, (2) he was doing his job well enough to meet his employer's legitimate expectations, (3) he was discharged or demoted, and (4) the employer sought a replacement for him. If the employee is successful, this creates a rebuttable presumption of discrimination, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. If the employer is successful, the presumption dissolves, and the burden shifts back to the employee to show that the employer's proffered reasons are a pretext.

*Karazanos,* at 335–6 (citations and parenthetical omitted). Rephrasing this passage for application to this Title IX case, the Court arrives at the following standard:

> The student must first establish a prima facie case of discrimination. The prima facie case has four elements. The student must show: (1) he was in the protected class, (2) he was performing the academic requirements well enough to meet his educator's legitimate expectations, (3) he suffered adverse treatment, and (4) the educational program continued to instruct and credit other students. If the student is successful, this creates a rebuttable presumption of discrimination, and the burden of production shifts to the educator to articulate a legitimate, nondiscriminatory reason for the adverse action taken against the student. If the educator is successful, the presumption dissolves, and the burden shifts back to the student to show that the educator's proffered reasons are a pretext.

Modified standard from *Karazanos v. Navistar Int'l Transp.,* 948 F.2d 332, 335–6 (7th Cir.1991) for application to Title IX cases.

## CONCLUSIONS OF LAW

1. The Court has Jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1681.

2. Summary Judgment should be granted where no material issue of fact exists. *Matsushita Electric v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ 3. Andriakos has failed to present evidence which satisfies the second element of a prima facie case: that he was performing the academic requirements well enough to meet his educator's legitimate expectations.

4. The Court finds it unnecessary to address what the proper role of a court in evaluating the faculty evaluations of students in a professional course of study should be since Andriakos has not presented any evidence that the evaluations of his educators were erroneous, that a different standard of evaluation should have been applied, or that the standards of evaluation were mis-applied in his case. Though Andriakos argues that he disagrees with his educators professional judgment, he has not presented any evidence with which this Court could determine whether their judgment was mis-applied. Therefore the Court accepts the results of the evaluations of Andriakos's educators without need to determine what standards should have been applied or whether the standards used were applied correctly.

5. The academic evaluations presented to this Court and excerpted in the findings of fact sufficiently show that Andriakos failed to meet his educators' legitimate expectations concerning his academic performance.

■ 6. Even assuming that this Court would have found that Andriakos had presented a prima facie case, the Court finds that the academic evaluations presented to this Court and excerpted in the findings of fact sufficiently present a legitimate nondiscriminatory reason for failing Andriakos. Further the Court finds that Andriakos has failed to present evidence showing pretext.

7. Though Andriakos has presented his deposition and the affidavit of Sally Moffatt, this evidence does not make a showing of pretext.

8. There is nothing in the evidence presented which indicates that "but for" Andriakos being male he would not have failed N242. Andriakos has failed to show that "but for" his being male he would not have been expelled from the nursing program. *Cf. Matthews v. Allis–Chalmers,* 769 F.2d 1215 (7th Cir.1985).

■ 9. Though Andriakos argues that female students were treated differently and Moffatt's affidavit states that Andriakos was

treated differently than other students by Franks, he has failed to produce any evidence this disparity in treatment was motivated by sexual discrimination beyond ·his mere assertion. The plaintiff's mere assertions that he believes that he was discriminated against are insufficient to survive a motion for summary judgment. *See Dale v. Chicago Tribune,* 797 F.2d 458 (7th Cir. 1986).

■ 10. Moffatt's affidavit does not say that Franks treated males differently, it says that Franks treated Andriakos differently. This evidence fails to establish that sexual discrimination was the basis of that difference. It is also significant that no mention is made of Graul other than by Andriakos.

11. Moffatt's assertion that while a fellow student with Andriakos she observed nothing in his academic performance which warranted his failure does not challenge the academic evaluations of his educators who did observe such behavior.

12. Summary Judgment is proper here since Andriakos has failed to present evidence of a genuine issue of material fact and as a matter of law he has failed to present a prima facie case of discrimination pursuant to Title IX.

*CONCLUSION*

Taken as a whole, the professional analysis of the course instructors seem reasonable and presents no evidence sexual discrimination. The School of Nursing attempted to assist Andriakos by providing him with two opportunities to pass N242, a deviation from their stated policy. There is no evidence before this Court which indicates that Andriakos was expelled from the nursing program based on his sex. There is ample evidence that his expulsion was based on his multiple failure to adequately demonstrate safe and professional nursing skills. Summary Judgment is GRANTED in favor of the Defendants and against Louis Andriakos on the final basis for his complaint, violation of Title IX.